JAMES W. WHITE, Employee, Plaintiff v. WEYERHAEUSER COMPANY, Employer, SELF-INSURED, Defendant

No. COA03-1337

(Filed 4 January 2005)

**1. Appeal and Error— preservation of issues—failure to raise sufficiency of evidence—findings of fact binding**

Defendant employer failed under both the former and current Rules of Appellate Procedure to raise on appeal the sufficiency of the evidence to support the Commission's findings of fact, and therefore, the findings of fact are binding on appeal. N.C. R. App. P. 10(c)(1).

**2. Workers' Compensation— refusal of suitable employment—involuntary resignation**

The Industrial Commission did not err in a workers' compensation case by failing to conclude that plaintiff employee refused suitable employment pursuant to N.C.G.S. § 97-32 based on plaintiff's tendering his resignation, because: (1) plaintiff's conduct did not constitute constructive refusal of employment when the Commission found that plaintiff did not voluntarily resign from his employment, and thus his termination from employment must be analyzed pursuant to *Seagraves v. Austin Co. of Greensboro,* 123 N.C. App. 228 (1996); (2) when an employee resigns in the face of imminent termination of his employment, the Commission may conclude that the employee's employment ended involuntarily but it does not have to do so if it does not believe that the resignation was in fact forced by the employer's termination decision; (3) evidence supports plaintiff's assertion that he was going to be fired since defendant failed to properly assign error to the Commission's findings of fact; and (4) the evidence does not show that plaintiff was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee ordinarily would have been terminated.

**3. Workers' Compensation— temporary total disability—partial disability**

The Industrial Commission did not err by awarding plaintiff worker temporary total disability benefits from 26 July 2001 through 7 January 2002 and partial disability benefits beginning 8 January 2002, because: (1) the fact that an employee is capable of performing employment tendered by the employer is not, as a

**WHITE v. WEYERHAEUSER CO.**

[167 N.C. App. 658 (2005)]

matter of law, an indication of plaintiff's ability to earn wages; (2) any claim that there is no disability if the employee is receiving the same wages in the same or other employment is correct only so long as the employment reflects the employee's ability to earn wages in the competitive market; (3) absence of medical evidence does not preclude a finding of disability; and (4) there was competent evidence in the record to support the Commission's finding that plaintiff had demonstrated a reduced wage earning capacity.

Appeal by defendant from Opinion and Award filed 14 July 2003 by the North Carolina Industrial Commission. Heard in the Court of Appeals 27 May 2004.

*Kellum Law Firm, by J. Kevin Jones, for plaintiff-appellee.*

*Ward and Smith, P.A., by S. McKinley Gray, III and James R. Cummings, for defendant-appellant.*

GEER, Judge.

Defendant Weyerhaeuser Company appeals from the Full Commission's Opinion and Award awarding temporary disability benefits to plaintiff James W. White. Weyerhaeuser argues primarily that White's resignation of his position with Weyerhaeuser precluded any award of disability benefits. Because the Commission found that White's resignation was not voluntary, but rather was in response to Weyerhaeuser's expressed intent to terminate his employment, we hold that the Commission properly analyzed this case under *Seagraves v. Austin Co. of Greensboro*, 123 N.C. App. 228, 472 S.E.2d 397 (1996).

### Standard of Review

In reviewing a decision by the Commission, this Court's role "is limited to determining whether there is any competent evidence to support the findings of fact, and whether the findings of fact justify the conclusions of law." *Cross v. Blue Cross/Blue Shield*, 104 N.C. App. 284, 285-86, 409 S.E.2d 103, 104 (1991). Under N.C.R. App. P. 10(a), our review is further limited to those findings of fact and conclusions of law properly assigned as error.

[1] In this case, apparently operating based on an outdated version of our Appellate Rules, Weyerhaeuser has assigned error only to certain conclusions of law, but under each of the assignments of error has

listed "Defendant's Exception[s]," referring to "exception[s]" typed onto a copy of the Commission's Opinion and Award. Nowhere in Weyerhaeuser's assignments of error or in the typewritten exceptions does the company state any specific reason that the findings of fact are in error.

The former version of Rule 10 of our Rules of Appellate Procedure "require[d] that all assignments of error should be followed by a listing of the exceptions on which they are based, and that these exceptions should be identified by the pages of the record at which they appear." *Peoples Serv. Drug Stores, Inc. v. Mayfair, N. V. (Micora, N. V.)*, 50 N.C. App. 442, 446, 274 S.E.2d 365, 368 (1981). It appears that Weyerhaeuser has adhered to the procedure set forth in this older version of the Rule.

In 1988, Rule 10 was amended "to put an end to the formality of marking exceptions in the transcript of the proceedings as formerly required by Rule 10(b)(2). Accordingly, the language of the former Rule 10(b)(2), requiring that the record on appeal reflect a separate exception for each finding of fact assigned as error, was deleted from the current version of Rule 10(b)(2)." *State v. Canady*, 330 N.C. 398, 404-05, 410 S.E.2d 875, 879 (1991) (Meyer, J., dissenting). The current Rule 10 provides:

> A listing of the assignments of error upon which an appeal is predicated shall be stated at the conclusion of the record on appeal, in short form without argument, and shall be separately numbered. Each assignment of error shall, so far as practicable, be confined to a single issue of law; and shall state plainly, concisely and without argumentation the legal basis upon which error is assigned. An assignment of error is sufficient if it directs the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references. Questions made as to several issues or findings relating to one ground of recovery or defense may be combined in one assignment of error, if separate record or transcript references are made.

N.C.R. App. P. 10(c)(1).

Under this rule, an appellant is required to specifically assign error to each finding of fact that it contends is not supported by competent evidence. "[F]indings of fact to which [an appellant] has not assigned error and argued in his brief are conclusively established on appeal." *Static Control Components, Inc. v. Vogler*, 152 N.C. App.

599, 603, 568 S.E.2d 305, 308 (2002). Thus, "[a] single assignment [of error] generally challenging the sufficiency of the evidence to support numerous findings of fact . . . is broadside and ineffective" under N.C.R. App. P. 10. *Wade v. Wade*, 72 N.C. App. 372, 375-76, 325 S.E.2d 260, 266, *disc. review denied*, 313 N.C. 612, 330 S.E.2d 616 (1985). Since Weyerhaeuser has failed to challenge the sufficiency of the evidence to support the Commission's specific findings of fact, they are binding on appeal under the current rules.

In any event, a review of older cases applying the former rules reveals that, even under those rules, Weyerhaeuser has failed to properly present for appellate review the adequacy of the evidence to support the Commission's findings of fact. Under the former procedure, when, as here, assignments of error challenged only a conclusion of law, but listed under those assignments of error exceptions to specific findings of fact, the assignments of error "raise[d] only the question whether the facts found support the judgment, or whether error of law appears on the face of the record." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 662, 158 S.E.2d 840, 842 (1968). *See also Dobias v. White*, 240 N.C. 680, 689, 83 S.E.2d 785, 791 (1954) (appellant required to list a separate assignment of error for each finding of fact that appellant contends was not supported by evidence).

Weyerhaeuser has thus failed under both the former and current rules to raise on appeal the sufficiency of the evidence to support the Commission's findings of fact. The Commission's findings of fact are, therefore, binding on appeal.

Facts

White began working for Weyerhaeuser as a utility person on 15 August 1988. He received several promotions and in December 2000 held the position of night shift lead maintenance technician at Weyerhaeuser's New Bern sawmill plant. On 12 December 2000, White was working on a ladder when the ladder shook underneath him and he fell. He twisted his body and reached behind him with his right arm in an attempt to catch himself as he hit the floor. The safety incident investigation report stated that the cause of the accident was an insecure grip or hold and defective or unsafe equipment; it also noted that the floor had rain, oil, and grease on it.

Immediately after his fall, White's right thumb was bleeding and his right arm was numb. Since the plant nurse did not work during the

night shift, White's shift supervisor, Don O'Neal, wrapped the thumb to stop the bleeding and had White sit in the office for the remaining three hours and 45 minutes of the shift. The Commission found that O'Neal filled out an incident report, but denied White's request for immediate medical treatment for his shoulder and thumb.

After White's shift ended at 6:00 or 7:00 a.m., he went home and slept. When he awoke at 1:00 p.m., his thumb was still bleeding and his shoulder was sore. White went to Eastern Carolina Internal Medicine Urgent Care, the medical facility designated by Weyerhaeuser in its policy handbook for treatment of work-related injuries. White received stitches in his thumb and pain medication for his shoulder.

On 13 December 2000, White received a letter of reprimand, labeled as a "Group II" violation, from his supervisor Buddy Taylor for "failure to obey written or oral instructions" and for engaging in horseplay. White testified he received the reprimand because he did not notify Taylor or Jean Matthews, a human resources employee, of the accident and because he went to the doctor without first going to the company nurse.

The New Bern sawmill plant rules divide rule violations into two types—Group I or Group II—based on the seriousness of the offense. Group I violations are subject to progressive discipline, including: (1) an oral warning, (2) a written reprimand, (3) a three-day layoff and final warning, and (4) a suspension followed by further disciplinary action, up to and including discharge. Group II violations are subject only to step 4.

White returned to work at Weyerhaeuser on light duty, but his shoulder continued to hurt. In early February 2001, he was referred to Dr. Mark Wertman, an orthopedic surgeon, who ordered an MRI on White's shoulder. The MRI revealed that White had a torn rotator cuff. On 30 March 2001, Dr. Wertman performed successful surgery on White's shoulder to repair the torn rotator cuff.

Weyerhaeuser admitted compensability of White's injury by filing a Form 60 ("Employer's Admission of Employee's Right to Compensation Pursuant to NC Gen. Stat. § 97-18(b)") on 11 April 2001.

After the surgery, White initially was unable to work and received temporary total disability benefits. Weyerhaeuser wrote Dr. Wertman correspondence within one week of the surgery requesting that White be returned to light duty work. White returned to work on 9 April

2001, again on a light duty basis, with restrictions on driving, lifting, and using his right arm. On 14 June 2001, Dr. Wertman advised White to do no overhead lifting and to lift a maximum of 15 pounds at waist level.

In June 2001, White received a second reprimand for a Group II violation for failure to obey written or oral instructions. White testified that he received the reprimand for leaving a message with his supervisor, Buddy Taylor, rather than speaking with him personally to request time off to take care of affairs related to the death of his father. White received approved leave to be with his father in the week preceding his father's death. Upon his father's death, he spoke with his unit leader at the plant, seeking additional time. White testified that he believed a unit leader had the authority to grant such leave and that the leave had been granted. The Commission found (1) that Weyerhaeuser presented no evidence to show that White's beliefs in this regard were incorrect and (2) that the agreement between Weyerhaeuser and the union does not specify notification requirements for funeral leave apart from requiring proof of a relationship with the deceased. When White returned to work, he presented Taylor with his father's obituary, but Taylor required that he obtain his father's hospital records in order to be paid for the leave.

As White's shoulder continued to improve, he was allowed to use it more at work, and his hours gradually increased. White's restrictions were changed to permit lifting of 25 pounds at waist level by 10 July 2001. The Commission found that in July 2001, White was able to resume his normal work hours and earn his former wages. Weyerhaeuser, however, continued to provide him with a helper to assist him with tasks he was unable to perform.

On 25 July 2001, White was performing maintenance on a sawdust conveyer along with two other maintenance technicians, Steve Roper and Felicia James. Weyerhaeuser had a "lockout" safety procedure that required each employee performing maintenance on equipment to place his or her personal padlock on the power control device for the equipment in order to prevent the equipment from being turned on. After White and the other technicians had finished tightening the chains on the conveyor, a lead person, Milton Craft, approached and asked them to remove their locks from the conveyor's power control device. White and Roper removed their locks and were waiting for James to return and remove her lock. While they were waiting, Taylor approached White and asked what they were doing. When White told him that they had been tightening the conveyor chains, Taylor asked

how tight the chain was. White reached into the machine and shook the chain to demonstrate. White testified that the machine could not have been operated at the time because James' lock, which was in full view of White and Taylor, was still on the power control device.

Although Taylor made no objection at the time, he returned an hour later and informed White that when he reached into the machine without his lock being on the machine, he had committed a "lockout violation." White, who was a member of Local 1325 of the Paper, Allied-Industrial, Chemical and Energy Workers International Union AFL-CIO, filed a grievance with the union.

The day after the "lockout violation," White was called in to talk to his union president and shop steward. They notified him that Weyerhaeuser was going to send him home and terminate him for having received three Group II violations. Under the issue resolution procedure clause of the agreement between Weyerhaeuser and the union, the union shop steward was involved in negotiating grievances and received copies of all reprimands. The union representatives advised White that it would be in his interest to resign rather than have a termination on his record. Based on this advice, White tendered a letter of resignation to Weyerhaeuser on the same day.

White had been employed at Weyerhaeuser for 12 years prior to his injury, and in that time, he had received only one reprimand. In the seven months following his injury, White received two Group II reprimands and anticipated a third Group II reprimand on the day he resigned. The Commission found that no evidence was presented to show that a nondisabled employee would have been reprimanded for similar violations.

After he resigned, White began looking for other work. For approximately five months, White applied for various jobs, both directly and through the Employment Security Commission. Some of the companies informed him that they did not have any work for him because he was still on light-duty restrictions.

Dr. Wertman released White from his care on 22 October 2001, concluding that he had reached maximum medical improvement with a five percent impairment of his right arm and no impairment of his thumb as a result of the accident. White was unable to find employment until 8 January 2002, when he began working for Kopeland Construction Company at $8.00 per hour as a general laborer. White left Kopeland for a permanent job with E & J Automotive, also at

$8.00 per hour, where he remained employed as of the hearing before the Deputy Commissioner. The Commission found that "[b]oth jobs paid considerably lower wages than he had earned while working for defendant."

After White's resignation, Weyerhaeuser refused to pay temporary total disability benefits, and White requested that his claim be assigned for hearing. On 29 August 2002, Deputy Commissioner Morgan S. Chapman filed an Opinion and Award denying White's claim for additional compensation. White appealed to the Full Commission. In an Opinion and Award filed on 14 July 2003, the Commission concluded that as a result of his compensable injury by accident, White was disabled and was entitled to compensation for total disability benefits for the period between 26 July 2001 and 7 January 2002 and for partial disability benefits beginning 8 January 2002 and continuing for 300 weeks from the date of injury or until White began earning the same wage as he made on 12 December 2000. Weyerhaeuser filed timely notice of appeal to this Court.

I

[2] Weyerhaeuser contends that the Full Commission erred in failing to conclude that by tendering his resignation, White refused suitable employment pursuant to N.C. Gen. Stat. § 97-32 (2003). That section provides:

> If an injured employee refuses employment procured for him suitable to his capacity he shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Industrial Commission such refusal was justified.

N.C. Gen. Stat. § 97-32. "The burden is on the employer to show that plaintiff refused suitable employment." *Gordon v. City of Durham*, 153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002).

In applying the statute, the first question is whether the plaintiff's employment was voluntarily or involuntarily terminated. If the termination is voluntary and the "employer meets its burden of showing that a plaintiff unjustifiably refused suitable employment, then the employee is not entitled to any further benefits under N.C. Gen. Stat. §§ 97-29 or 97-30." *Whitfield v. Lab. Corp. of Am.*, 158 N.C. App. 341, 354-55, 581 S.E.2d 778, 787 (2003). If the departure is determined to be involuntary, the question becomes whether the termination amounted to a constructive refusal of suitable work

under *Seagraves v. Austin Co. of Greensboro*, 123 N.C. App. 228, 472 S.E.2d 397 (1996).[1]

As this Court explained in *Seagraves*:

[W]here an employee, who has sustained a compensable injury and has been provided light duty or rehabilitative employment, is terminated from such employment for misconduct or other fault on the part of the employee, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the employee from receiving benefits for temporary partial or total disability. Rather, the test is whether the employee's loss of, or diminution in, wages is attributable to the wrongful act resulting in loss of employment, in which case benefits will be barred, or whether such loss or diminution in earning capacity is due to the employee's work-related disability, in which case the employee will be entitled to benefits for such disability.

123 N.C. App. at 233-34, 472 S.E.2d at 401. In cases involving an involuntary termination, "the employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee would ordinarily have been terminated." *Id.* at 234, 472 S.E.2d at 401. If the employer meets its burden, "the employee's misconduct will be deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless the employee is then able to show that his or her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability." *Id.*

Weyerhaeuser argues that *Seagraves* is inapplicable in this case because White was not terminated, but rather voluntarily resigned. Because Weyerhaeuser bore the burden of proving that White refused suitable employment, it bore the burden of proving that White rejected his job by voluntarily resigning. Weyerhaeuser chose not to offer any evidence on this issue, but rather to rely only on cross-examination of White. After reviewing the evidence, the Commission rejected Weyerhaeuser's factual contentions and found that White's termination of employment was not voluntary:

29. Plaintiff reported for work on July 26, 2001 and was approached by the union president and union shop steward who

---

1. The Supreme Court has expressly approved the *Seagraves* analysis. *McRae v. Toastmaster, Inc.*, 358 N.C. 488, 495, 597 S.E.2d 695, 700 (2004).

informed plaintiff that he was to be sent home and then terminated for having received three Group II violations. Under the Issue Resolution Procedure Clause of the Agreement between Weyerhaeuser New Bern Sawmill and AFL-CIO, the shop steward was involved in negotiating disputes and copies of reprimands were provided to the union.

30. Plaintiff testified that he was advised by his union president and the shop steward that in lieu of having a termination on his record, it would be preferable for plaintiff to resign.

. . . .

32. On July 26, 2001, plaintiff submitted a written resignation to defendant. Plaintiff testified that he resigned based upon what his union representatives advised him to do.

. . . .

42. Plaintiff reasonably believed that he was to be terminated based upon the information he was given by the union president and union shop steward and he reasonably relied on that information as the bases for his resignation. Plaintiff's belief that termination was imminent was not rebutted by defendant at the hearing before Deputy Commissioner Chapman. The Full Commission finds that plaintiff's termination of employment was not voluntary, but rather was predicated on information from his union officials, as well as the witness report filed by his supervisor and his previous reprimands.

Since Weyerhaeuser did not properly assign error to these findings, they are binding on appeal. The question remains whether these findings support the Commission's conclusion that "[p]laintiff did not voluntarily resign from his employment on July 26, 2001, and thus his termination from employment must be analyzed pursuant to *Seagraves v. Austin Co. of Greensboro* . . . ."

Weyerhaeuser urges this Court to hold that *Seagraves* cannot ever apply when an employee has resigned. To do so would be to exalt form over substance in a manner inconsistent with the underlying purpose of the Workers' Compensation Act to "provide compensation to workers whose earning capacity is diminished or destroyed by injury arising from their employment." *Seagraves*, 123 N.C. App. at 233, 472 S.E.2d at 401. We hold that when an employee resigns

in the face of imminent termination of his or her employment, the Commission may conclude that the employee's employment ended involuntarily.

While our appellate courts have not previously addressed this issue in the workers' compensation context, we find guidance in opinions construing our unemployment statutes. Under the Employment Security Act, an employee is disqualified from receiving unemployment benefits if he or she leaves work voluntarily without good cause attributable to the employer. N.C. Gen. Stat. § 96-14(1) (2003). In *In re Werner*, 44 N.C. App. 723, 727, 263 S.E.2d 4, 7 (1980), this Court held that an employee's departure was not voluntary when she chose to resign rather than be terminated. Similarly, in *Bunn v. N.C. State Univ.*, 70 N.C. App. 699, 704, 321 S.E.2d 32, 35 (1984), *disc. review denied*, 313 N.C. 173, 326 S.E.2d 31 (1985), this Court held that a resignation was not voluntary when the plaintiff resigned in the face of the employer's decision to terminate her at a later date because of her inability to perform the job. This Court reasoned:

> Although [plaintiff] did have to make the ultimate choice not to return to work, still we cannot say that her decision was entirely free, or spontaneous. We agree with the court in *Dept. of Labor and Industry v. Unemployment Compensation Board of Review (In Re John Priest)*, 133 Pa. Super. 518, 3 A. 2d 211 (1938), that an individual's decision to leave work when informed of an imminent discharge or layoff is a consequence of the employer's decision to discharge and is not wholly voluntary.

*Bunn*, 70 N.C. App. at 702, 321 S.E.2d at 34. *See also In re Poteat*, 319 N.C. 201, 205, 353 S.E.2d 219, 222 (1987) (" '[A]n employee has not left his job voluntarily when events beyond the employee's control or the wishes of the employer cause the termination.' " (quoting *Eason v. Gould, Inc.*, 66 N.C. App. 260, 262, 311 S.E.2d 372, 373 (1984), *aff'd by equally divided court*, 312 N.C. 618, 324 S.E.2d 223 (1985))).

We believe that this analysis is equally appropriate in the workers' compensation context. If an employee resigns his job in the face of an imminent dismissal, then the Commission *may* reasonably find that the resignation is involuntary, as it did here. It is not, however, required to do so if it does not believe that the resignation was in fact forced by the employer's termination decision.

This approach is consistent with the policies underlying the Workers' Compensation Act. There is no question that had White

waited until Weyerhaeuser actually fired him, then the Commission could still have awarded benefits under the *Seagraves* test even if the termination was justified by misconduct. *McRae*, 358 N.C. at 495, 597 S.E.2d at 700. An employee may, however, wish to resign and preserve an otherwise positive work record rather than wait for an inevitable firing that could make it much more difficult to find other employment. *See Thomas v. D.C. Dep't of Labor*, 409 A.2d 164, 170 (D.C. 1979) (noting "[i]t is unquestionably true" that an employee, facing an imminent termination, reaps a benefit by quitting and "hav[ing] a less-than-perfect work record erased"). Weyerhaeuser would have us hold that by choosing to resign in order to enhance his employability, White should be completely blocked from receiving benefits, even though had he waited for the inevitable firing, he would still be eligible for benefits. We cannot see how making this distinction is consistent with the policies underlying the Workers' Compensation Act. *Cf. Werner*, 44 N.C. App. at 727, 263 S.E.2d at 7 ("Perceiving that well-intentioned employers may prefer to allow the unsuitable employee the dignity of resignation, we believe that there are strong public policy reasons for not discouraging employers from exercising this option.").

Weyerhaeuser also argues that there was no evidence in the record to support a finding that it was going to terminate White's employment. Since Weyerhaeuser did not object to White's testimony regarding what the union officials told him Weyerhaeuser had decided, that evidence supports White's assertion that he was going to be fired. Weyerhaeuser offered no contrary evidence even though the relevant decisionmaker was present and could have testified.[2] Instead, Weyerhaeuser asked the Commission to infer that White's resignation was premature from White's general testimony regarding company policies. This inference necessitated a leap that the Commission was not required to make. *Norman v. N.C. Dep't of Transp.*, 161 N.C. App. 211, 224, 588 S.E.2d 42, 51 (2003) ("The decision regarding which inference to draw was for the Commission and may not be overturned on appeal."), *disc. review denied*, 358 N.C. 235, 595 S.E.2d 153, *cert. denied*, 358 N.C. 545, 599 S.E.2d 404 (2004). In any event, since Weyerhaeuser failed to properly assign error to the Commission's findings of fact, this issue is not before us.

---

2. The Commission found that the record reflected that Taylor, White's supervisor, was present in the courtroom during the hearing before the Deputy Commissioner, but did not testify.

Since the Commission found White's resignation to be involuntary, it properly analyzed the case under *Seagraves*. When applying the *Seagraves* test:

> the Commission must determine first if the employer has met its burden of showing that the employee was terminated for misconduct, that such misconduct would have resulted in the termination of a nondisabled employee, and that the termination was unrelated to the employee's compensable injury. Assuming the employer has satisfied such burden, the Commission must then determine if the employee has demonstrated that her inability to perform work assignments for the employer, or to procure commensurate work from other prospective employers, is a consequence of her work-related injury.

*McRae*, 358 N.C. at 496-97, 597 S.E.2d at 701. The Commission concluded here that "[t]he evidence in this case does not show that plaintiff was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee ordinarily [sic] would have been terminated. . . . Therefore, plaintiff's conduct does not constitute a constructive refusal of employment." Since Weyerhaeuser has not challenged this conclusion in its brief or assigned error to the underlying findings of fact, we affirm the Commission's determination that plaintiff did not constructively refuse employment under N.C. Gen. Stat. § 97-32.

II

[3] Weyerhaeuser also contends that the Full Commission erred in granting White temporary total disability benefits from 26 July 2001 through 7 January 2002 and partial disability benefits beginning 8 January 2002. The determination that an employee is disabled is a conclusion of law that must be based upon findings of fact supported by competent evidence. *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982).

In order to support a conclusion of disability, the Commission must find:

> (1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury.

*Id.* Under this test, "[t]he burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment." *Russell v. Lowes Prod. Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).

Weyerhaeuser argues first that the Commission's finding that "in July 2001, Plaintiff was able to resume his normal work hours and earn his former wages," compelled the conclusion that White is no longer disabled. This argument was, however, expressly rejected in *Saums v. Raleigh Cmty. Hosp.*, 346 N.C. 760, 764, 487 S.E.2d 746, 750 (1997), where our Supreme Court held that "the fact that an employee is capable of performing employment tendered by the employer is not, as a matter of law, an indication of plaintiff's ability to earn wages." *See also Peoples v. Cone Mills Corp.*, 316 N.C. 426, 438, 342 S.E.2d 798, 806 (1986) ("Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level."). The Supreme Court has clarified that any claim "that there is no disability if the employee is receiving the same wages in the same or other employment is correct only so long as the employment reflects the employee's ability to earn wages in the competitive market." *Id.* at 440, 342 S.E.2d at 807. Under *Saums* and *Peoples*, therefore, the Commission's finding that White had returned to his normal hours and wages did not require denial of White's claim.

In *Russell*, this Court held that an employee may meet his burden of proving disability in one of four ways:

> (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.

108 N.C. App. at 765, 425 S.E.2d at 457 (internal citations omitted). In finding that White was disabled, the Commission concluded that

White had established disability under both the second and fourth tests articulated in *Russell*.[3]

Weyerhaeuser argues, however, that "the undisputed medical evidence establishes that Plaintiff was and is capable of working in a full-duty capacity in the same type of employment as he performed for Weyerhaeuser." Medical evidence may be dispositive of only the first *Russell* test: "the production of medical evidence that [the worker] is physically or mentally, as a consequence of the work related injury, incapable of work in any employment[.]" *Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457. The absence of medical evidence does not preclude a finding of disability under one of the other three tests. *Bridwell v. Golden Corral Steak House*, 149 N.C. App. 338, 342, 561 S.E.2d 298, 302 ("While we agree that plaintiff's medical evidence is insufficient to show disability, we conclude that plaintiff has met his initial burden of production through other evidence."), *disc. review denied*, 355 N.C. 747, 565 S.E.2d 193 (2002).

White was permitted to meet his burden of proving disability by producing, as he did, "evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment" and "evidence that he has obtained other employment at a wage less than that earned prior to the injury." *Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457. The Commission found that White satisfied his burden under both options:

> 45. Plaintiff made reasonable efforts to find suitable employment after his termination from defendant's employment but none was available to him within his physical restrictions until he returned to employment at reduced wages on January 8, 2002.

> 46. Plaintiff's wages since January 8, 2002 are less than he was making at the time of his injury by accident and plaintiff's decreased ability to earn is due to his disability result-

---

3. Weyerhaeuser contends that the *Russell* tests only apply to the second prong of *Hilliard*. This contention is contrary to this Court's opinion in *Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457 (holding that the four tests provide the means by which an employee may show "that he is unable to earn the same wages he had earned before the injury, either in the same employment [*Hilliard* prong one] or in other employment [*Hilliard* prong two]"). Although Weyerhaeuser cites *Grantham v. R. G. Barry Corp.*, 115 N.C. App. 293, 444 S.E.2d 659 (1994), that opinion does not necessarily support its position and, in any event, *Grantham* could not overrule *Russell. See In re Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

**WHITE v. WEYERHAEUSER CO.**

[167 N.C. App. 658 (2005)]

ing from the admittedly compensable injury by accident on December 12, 2000.

These findings are binding on appeal and are sufficient to support the Commission's decision. *Whitfield*, 158 N.C. App. at 354, 581 S.E.2d at 787 ("Thus, there is competent evidence in the record to support the Commission's finding that plaintiff had demonstrated a reduced wage earning capacity under the fourth option. This finding, based on the competent evidence in the record, was a proper basis for the Commission to award plaintiff partial disability benefits.").

Finally, Weyerhaeuser argues that White failed to meet his burden of proving causation, the third prong of *Hilliard*, 305 N.C. at 595, 290 S.E.2d at 683. The Commission found that "plaintiff's decreased ability to earn is due to his disability resulting from the admittedly compensable injury by accident on December 12, 2000." Weyerhaeuser argues primarily that White's loss of wage-earning capacity was caused by his resignation and not his injury. We have already addressed this issue, as discussed above. In any event, the record contains competent evidence of causation, including White's testimony that he was informed by prospective employers that they did not have a position for him while he was on light-duty work restrictions. Weyerhaeuser's argument that the Commission should have weighed and viewed the evidence differently is not an argument that this Court may consider. *See Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998) (appellate court may not re-weigh the evidence or assess credibility).

In sum, we hold that the findings of fact properly supported the Commission's decision to analyze this case under *Seagraves* and that the Commission's findings support the Commission's conclusion that White was totally disabled from 26 July 2001 through 7 January 2002, at which point White became partially disabled.

Affirmed.

Judges HUDSON and THORNBURG concur.

Judge THORNBURG concurred prior to 31 December 2004.