DUSTY RENFRO, Employee, Plaintiff v. RICHARDSON SPORTS LTD. PARTNERS d/b/a
CAROLINA PANTHERS, Employer and LEGION INSURANCE COMPANY
(CAMERON M. HARRIS & COMPANY, Servicing Agent), Carrier, Defendants

No. COA04-1407

(Filed 2 August 2005)

**1. Workers' Compensation— professional football player—
wrist injury during practice—unusual move—compensable**

A professional football player suffered a compensable injury by accident to his wrist during a practice, his normal work duty, when he was forced by another player into an unusual and awkward position and used a technique not used in his normal work routine.

**2. Workers' Compensation— professional athlete—weekly
compensation—use of future earnings—sufficiency of
evidence**

There were exceptional reasons for using an injured professional football player's future earnings under his contract rather then his prior earnings to determine his average weekly wage for workers' compensation.

**3. Workers' Compensation— professional football player—
ability to make the team without injury—greater weight of
the evidence**

The Industrial Commission's finding in a workers' compensation case that the greater weight of the evidence was that a professional football player injured in training camp would have made the team but for his wrist injury was supported by the testimony of plaintiff and a team position coach.

**4. Workers' Compensation— disability—professional athlete—diminished earnings**

Under the Workers' Compensation Act, disability is not defined as an injury or infirmity, but as a diminished capacity to earn wages. The Industrial Commission did not err by finding that a professional football player was partially disabled after a wrist injury where plaintiff demonstrated his diminished wage earning capacity by presenting evidence that he obtained other employment (as a realtor) at less than he earned before his injury.

**5. Workers' Compensation— professional football player— inability to earn same income—sufficiency of the evidence**

Competent evidence supported an Industrial Commission finding, which supported a conclusion, that a professional football player was unable to obtain employment for a time after he hurt his wrist, and then worked only as a real estate broker on a commission basis.

**6. Workers' Compensation— professional football player— fractured wrist—sufficiency of evidence**

There was competent evidence in a workers' compensation case supporting the Industrial Commission's determination that a professional football player had suffered a fractured wrist.

**7. Workers' Compensation— hearsay evidence—coaches and employees of professional football team—agency exception**

The Industrial Commission correctly heard testimony about statements made by a professional football team's director of pro scouting and two position coaches in a workers' compensation case, even though defendant contended that those statements were hearsay. There is a hearsay exception in N.C.G.S. § 8C-1, Rule 801(d) for statements made by agents or a person authorized to make a statement on the subject.

**8. Workers' Compensation— professional football player— post-injury grievance settlement—credit**

The Industrial Commission did not err in a workers' compensation case involving an injured professional football player by determining that defendant was entitled to a dollar-for-dollar credit for a post-injury grievance settlement. N.C.G.S. § 97-42 allows an employer to include language in a wage-replacement plan that allows a dollar-for-dollar credit.

Appeal by plaintiff and defendants from an Opinion and Award entered 2 July 2004 by the North Carolina Industrial Commission. Heard in the Court of Appeals 14 June 2005.

*R. James Lore for plaintiff-appellant.*

*Hedrick Eatman Gardner & Kincheloe, L.L.P., by Hatcher B. Kincheloe and Shannon P. Herndon, for defendant-appellants.*

**RENFRO v. RICHARDSON SPORTS LTD. PARTNERS**

[172 N.C. App. 176 (2005)]

HUNTER, Judge.

Dusty Renfro ("plaintiff") and Richardson Sports Limited Partners ("defendant") present cross-appeals from the Opinion and Award of the North Carolina Industrial Commission awarding plaintiff workers' compensation benefits. Defendant presents the following issues for our consideration: Whether the Commission erroneously (I) found that plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment on 7 August 2001; (II) determined plaintiff's average weekly wage; (III) awarded plaintiff 300 weeks of benefits pursuant to N.C. Gen. Stat. § 97-30; and (IV) allowed hearsay testimony into evidence. In the cross-appeal, plaintiff contends the Commission erroneously determined defendant was entitled to a dollar-for-dollar credit. After careful review, we affirm the Commission's Opinion and Award.

The evidence tends to show that plaintiff suffered a wrist injury during a 7 August 2001 pre-season practice with the Carolina Panthers. Prior to this injury, plaintiff played football at the University of Texas as a middle linebacker and backup deep snapper from 1995-1998. After graduating in 1999, plaintiff signed as a free agent with the Buffalo Bills, attended the Buffalo Bills training camp, and played in three pre-season football games. After the third pre-season game, plaintiff was released from the Buffalo Bills and did not become a member of that team's 1999 active roster. Plaintiff did not play professional football for any NFL team during the 1999 season. The following spring, plaintiff was drafted by the Rhine Fire, an NFL Europe team located in Dusseldorf, Germany. Plaintiff played as a middle linebacker and deep snapper for the Rhine Fire from March through July 2000. During the 2000 NFL season, plaintiff did not play for any NFL teams. However, plaintiff did sign a contract with the Las Vegas Outlaws, an XFL team, but did not make the Outlaws' active roster for the 2000 season. The next winter, plaintiff signed a one-year contract with the Carolina Panthers in late January or early February 2001. The Carolina Panthers sent plaintiff to Glascoe, Scotland to play for the Scottish Claymores, an NFL Europe football team. After playing in NFL Europe from March to July 2001, plaintiff reported to the Carolina Panthers's training camp in late July 2001.

During the Carolina Panthers's training camp, plaintiff practiced with the linebackers. Before and after practice, plaintiff would demonstrate and practice his deep snapping technique with the other long snappers and special teams coaches. During practice on 7 August 2001, plaintiff injured his left wrist while blocking an offen-

RENFRO v. RICHARDSON SPORTS LTD. PARTNERS

[172 N.C. App. 176 (2005)]

sive lineman. Plaintiff indicated that after initiating his blocking technique in the normal fashion, his left wrist was forced into an awkward position. Whereas players typically utilize an upward motion to block the other player, plaintiff's left hand and wrist was forced into a downward motion. Plaintiff immediately felt pain in his left wrist and sought treatment with the trainers.

Dr. Patrick Connor ("Dr. Connor"), the Panthers's team physician, initially believed plaintiff's wrist was possibly broken after reviewing plaintiff's x-ray. After reviewing an MRI, Dr. Connor opined plaintiff's wrist was sprained, and not fractured. A spica cast was placed on plaintiff's left hand and wrist. Plaintiff continued to practice and participated in the four pre-season games. Plaintiff's wrist continued to hurt and on 28 August 2001, plaintiff obtained a second opinion with Dr. Steven Sanford ("Dr. Sanford") in Charlotte, North Carolina. Dr. Sanford opined plaintiff's left wrist was fractured. A few days later on 2 September 2001, the Carolina Panthers notified plaintiff that he was being released. Plaintiff informed the Panthers that he had sought a second opinion and that Dr. Sanford indicated his wrist was broken. The Panthers then conducted further tests and the team doctors opined plaintiff's wrist was sprained and not broken.

Plaintiff returned to Texas, where he resided with his wife, and sought treatment with Dr. Bobby Wroten ("Dr. Wroten") on 26 September 2001. Plaintiff filed an injury grievance against the Panthers within a month after his release from the team. The injury grievance process is characterized as binding arbitration. Dr. Bruce Prager ("Dr. Prager"), an orthopedic surgeon, was designated as a neutral physician by the NFL Players' Association and his opinion would be utilized in the injury grievance process. Plaintiff was assessed by Dr. Prager on 26 September 2001 and he opined that plaintiff's wrist was broken. In November 2002, plaintiff, defendant, and Legion Insurance Company (collectively "defendants") settled the injury grievance for $35,294.00.

On 10 August 2001, the Panthers filed a Form 19, Employer's Report of Injury to Employee, with the Commission. A few months later, on 30 October 2001, plaintiff filed a Form 18, Notice of Accident to Employer and Claim of Employee. The Panthers denied plaintiff's workers' compensation claim on 16 November 2001 by filing a Form 61, Denial of Workers' Compensation Claim. Plaintiff requested the claim be assigned for a hearing, defendants filed a response, and Deputy Commissioner Bradley W. Houser filed an Opinion and Award denying plaintiff's claim on 3 October 2002. Plaintiff appealed to the

Full Commission and in a 2 July 2004 Opinion and Award, the Commission awarded plaintiff partial disability compensation at the maximum rate of $620.00 per week for a period of 300 weeks beginning from the date of his injury by accident. Defendants were awarded a dollar-for-dollar credit for the injury grievance settlement amount of $35,294.00 to be deducted from the end of the 300-week period. Defendants were also required to pay attorney's fees, medical and related costs, and the court costs. Plaintiff and defendants appeal.

## I. Defendants' Appeal

[1] Defendants first contend the Commission erroneously found that plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment on 7 August 2001. Specifically, the Panthers argue that plaintiff is not entitled to workers' compensation benefits because plaintiff was engaged in his normal work routine when he was injured.

N.C. Gen. Stat. § 97-2(6) (2003) of the Workers' Compensation Act limits recovery to "injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident. . . ." *Id.* As explained in *Searsey v. Construction Co.*, 35 N.C. App. 78, 79-80, 239 S.E.2d 847, 849 (1978):

> An "accident" is an unlooked for and untoward event not expected or designed by the employee. An "accident" is not established by the mere fact of injury but is to be considered as a separate event preceding and causing the injury. No matter how great the injury, if it is caused by an event that involves both an employee's normal work routine and normal working conditions it will not be considered to have been caused by accident.

*Id.* (citations omitted). "[U]nusualness and unexpectedness are its essence." *Smith v. Creamery Co.*, 217 N.C. 468, 472, 8 S.E.2d 231, 233 (1940). "To justify an award of compensation, the injury must involve more than the carrying on of usual and customary duties in the usual way." *Davis v. Raleigh Rental Center*, 58 N.C. App. 113, 116, 292 S.E.2d 763, 766 (1982).

"The issue of whether a particular accident arises out of and in the course of employment is a mixed question of fact and law[.]" *Hoyle v. Isenhour Brick and Tile Co.*, 306 N.C. 248, 251, 293 S.E.2d 196, 198 (1982). As recently explained by our Supreme Court,

RENFRO v. RICHARDSON SPORTS LTD. PARTNERS

[172 N.C. App. 176 (2005)]

when reviewing Industrial Commission decisions, appellate courts must examine "whether *any* competent evidence supports the Commission's findings of fact and whether [those] findings . . . support the Commission's conclusions of law." *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). The Commission's findings of fact are conclusive on appeal when supported by such competent evidence, "even though there [is] evidence that would support findings to the contrary." *Jones v. Myrtle Desk Co.*, 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965). However, evidence tending to support a plaintiff's claim is to be viewed in the light most favorable to the plaintiff, and "plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." *Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998); *see also Hollman v. City of Raleigh*, 273 N.C. 240, 252, 159 S.E.2d 874, 882 (1968) (holding that "our Workmen's Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees . . . , and its benefits should not be denied by a technical, narrow, and strict construction"). The Commission's conclusions of law are reviewed *de novo. Grantham v. R.G. Barry Corp.*, 127 N.C. App. 529, 534, 491 S.E.2d 678, 681 (1997), *disc. rev. denied*, 347 N.C. 671, 500 S.E.2d 86 (1998).

*McRae v. Toastmaster, Inc.*, 358 N.C. 488, 496, 597 S.E.2d 695, 700-01 (2004) (emphasis added).

The Commission rendered the following pertinent findings of fact:

9. At practice on August 7, 2001, plaintiff was playing defense at a linebacker position. During a particular play, plaintiff became engaged by a block from an offensive lineman.

10. At the point when the offensive player engaged plaintiff with the block, the impact caused plaintiff's left hand and wrist to be moved down and around, forcing it into what plaintiff described as an awkward position.

11. It was unexpected and unusual for the offensive player to block plaintiff with an impact that caused his left hand and wrist into an awkward position. At the time of injury, plaintiff was engaged in an activity within the scope of his employment contract and was taking reasonable measures to protect himself from injury, given the nature of the game. Plaintiff was required

to do what he was doing at the time of injury and had no choice but to perform his job as best he could, notwithstanding the risk of injury.

Our review of the record indicates these findings were supported by some competent evidence. First, the parties do not dispute that plaintiff injured his wrist during practice on 7 August 2001 while plaintiff was engaged in a block with an offensive lineman. Second, plaintiff testified as follows regarding his injury:

A. I was playing line backer, and a blocker came out, an offensive lineman, and I went to shed the block, to get around the blocker, and my hand was forced down to the left very vigorously, and it couldn't hold up to the strain that was put on it in that position, whenever a three hundred fifteen pound offensive lineman comes out on you.

. . .

Q. Had your hand ever been put in that position before to your knowledge?

A. No.

He further explained during cross that although he initiated the block using the normal technique, this time his hand was forced into an awkward position, and that "[u]sually whenever you're in an awkward position, you get injured." Plaintiff explained that "[t]here's a technique that you try to use each time." Plaintiff demonstrated the technique with his hands and showed the Commission that the wrist should be in an upward position when utilizing proper blocking technique. This testimony supports the findings of fact and the findings of fact support the following pertinent conclusion of law:

1. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendants on August 7, 2001. N.C. Gen. Stat. § 97-2(6). Although an injury sustained while playing football may not be an unusual occurrence, such injury is not a probable, intended consequence of the employment and constituted an unlooked for and untoward event that was not expected or designed by plaintiff. *See, Searsey v. Construction Co.*, 35 N.C. App. 78, 239 S.E.2d 847 (1978); *Pro-Football, Inc., T/A Washington Redskins and Gulf Insurance Company v. Jeffrey A. Uhlenhake*, 37 Va. App. 407, 558 S.E.2d 571 (2002), *aff'd*, 265 Va. 1, 574 S.E.2d 288 (2003).

**RENFRO v. RICHARDSON SPORTS LTD. PARTNERS**

[172 N.C. App. 176 (2005)]

(Emphasis omitted.) Indeed, plaintiff's testimony indicates that although he was engaging in his normal work duty of blocking an offensive lineman, he was injured because he was forced by another player into utilizing an unusual and awkward blocking or work technique that was not normally used in plaintiff's normal work routine. Therefore, plaintiff suffered a compensable injury by accident. *See Searsey*, 35 N.C. App. at 79-80, 239 S.E.2d at 849 (indicating that the injury must have been caused by an event that was not part of a claimant's normal working conditions or routine).

**[2]** Next, defendants contend the Commission erroneously determined plaintiff's average weekly wage by not basing its determination upon the money plaintiff earned as a professional football player prior to his injury.

Under N.C. Gen. Stat. § 97-2(5):

"Average weekly wages" shall mean the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury . . . . Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will be thereby obtained. Where, by reason of a shortness of time during which the employee has been in the employment of his employer or the casual nature or terms of his employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury was being earned by a person of the same grade and character employed in the same class of employment in the same locality or community.

But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.

*Id.; see also Larramore v. Richardson Sports Ltd. Partners*, 141 N.C. App. 250, 254-55, 540 S.E.2d 768, 770 (2000). " '[T]he intent of [G.S. § 97-2(5)] is to make certain that the results reached are fair and

just to both parties. . . . "Ordinarily, whether such results will be obtained . . . is a question of fact; and in such case a finding of fact by the Commission controls the decision." ' " *Larramore*, 141 N.C. App. at 255, 540 S.E.2d at 771 (citations omitted).

We reiterate that

> when reviewing Industrial Commission decisions, appellate courts must examine "whether *any* competent evidence supports the Commission's findings of fact and whether [those] findings . . . support the Commission's conclusions of law." The Commission's findings of fact are conclusive on appeal when supported by such competent evidence, "even though there [is] evidence that would support findings to the contrary." However, evidence tending to support a plaintiff's claim is to be viewed in the light most favorable to the plaintiff, and "plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." The Commission's conclusions of law are reviewed *de novo*.

*McRae v. Toastmaster, Inc.*, 358 N.C. at 496, 597 S.E.2d at 700-01 (citations omitted) (emphasis added).

In this case, the Commission determined exceptional reasons existed to justify the use of a different method of computing the average weekly wage in order to obtain an average weekly wage fair and just to both parties. In its findings of fact and conclusions of law, the Commission stated in pertinent part:

> 5. Pursuant to plaintiff's contract with defendants, had he made the team, he would have been entitled to an annual salary of $193,000.00 whether on the active or inactive rosters and would have been entitled to $111,000.00 if he were placed on the injured reserve list.

> 6. Plaintiff was paid his salary in weekly installments, and had an average weekly wage of $2,134.61 per week which would entitle him to the maximum compensation rate for 2001 of $620.00.

> 7. Following the signing of his contract, defendants requested that plaintiff be allocated from March 2001 through July 2001 to the Scottish Claymores Football team in Europe. Plaintiff reported to that team, played and had a productive season, earn-

ing approximately $1,100.00 per week, for a season of approximately ten weeks.

. . .

24. The nature of the NFL players' contract creates exceptional reasons as to why it is not unfair to either plaintiff or defendants to use the future earnings covered by his contract as a basis for calculating plaintiff's average weekly wage. . . .

In its conclusions of law, the Commission stated:

4. Exceptional reasons exist for using the method used herein for calculating plaintiff's average weekly wage that most accurately approximates the amount which plaintiff would be earning were it not for the injury he sustained. N.C. Gen. Stat. § 97-2(5). Plaintiff's average weekly wage should be determined from the amount he would have earned if he had continued to play football for defendants. This is the approach previously applied by the Commission for professional football players, which was affirmed on appeal. *Larramore v. Richardson Sports Ltd. Partners, supra.*

Defendants argue the Commission erroneously used the earnings plaintiff would have received under his contract with the Panthers to determine his average weekly wage because exceptional reasons did not exist in this case which would justify the use of plaintiff's future earnings. Defendants argue that unlike the circumstances in *Larramore* where the claimant did not have any prior earnings as a professional football player during the fifty-two weeks prior to the claimant's injury, in this case plaintiff played in NFL Europe and earned $1,100.00 per week during the relevant fifty-two week time period. Defendants also reference the $4,929.00 plaintiff earned during the six weeks plaintiff participated in practices and training camp.

Contrary to defendants' assertions regarding the *Larramore* opinion, this Court in *Larramore* indicated the Commission properly utilized a different method for calculating the claimant's average weekly wage because "given the circumstances and short duration of [the] plaintiff's employment, it was appropriate 'to resort to such other method of computing average weekly wages as [would] most nearly approximate the amount which the injured employee would be earning were it not for the injury.' " *Larramore*, 141 N.C. App. at 255, 540 S.E.2d at 770-71. Similar to plaintiff, the claimant in *Larramore*

participated in pre-season mini-camps and training camps and was paid a per diem amount for expenses and work performed. *Larramore*, 141 N.C. App. at 252-53, 540 S.E.2d at 769. The claimant was injured during one of the mini-camps and was released from the team during training camp. *Id.* Also, the claimant in *Larramore* had played professionally with the Buffalo Bills, but injured his ankle and was placed on the inactive roster. *Id.* at 257, 540 S.E.2d at 772. It is unclear from the facts in *Larramore* as to whether the claimant was on the inactive roster with the Buffalo Bills during the relevant fifty-two week time period. Nonetheless, similar to plaintiff, the claimant in *Larramore* had some earnings as a professional football player during the fifty-two week time period prior to his injury. In rejecting the use of the claimant's earnings during the fifty-two week time period prior to his injury to determine the average weekly wage, the Commission in *Larramore* determined that it would be fair and just to both parties to use the earnings Larramore would have earned under the contract to determine the average weekly wage.

In the present case, plaintiff earned $1,100.00 each week for ten weeks while playing in NFL Europe in the spring and early summer of 2001. Plaintiff also earned $4,929.00 during the six weeks he was in the Panthers's training camp. These amounts equal $15,929.00 for sixteen weeks of work during the fifty-two weeks prior to his injury. In contrast, plaintiff would have been entitled to an annual salary of $193,000.00 if he had made the Panthers's team and would have been entitled to $111,000.00 if he were placed on the Panthers's injured reserve list. Given the fact that plaintiff only worked sixteen weeks out of the fifty-two weeks prior to his injury and only earned approximately $16,000.00, the Commission's finding that exceptional reasons existed for using plaintiff's future earnings under the contract to determine the average weekly wage is supported by some competent evidence.

[3] Defendants also argue that it was not certain that plaintiff would have made the Panthers football team and therefore the Commission should not have used the potential earnings under the contract to determine the average weekly wage. In support of this argument, defendants reference the facts that plaintiff had never made the roster of any NFL team, that he had been cut during the training camp of the Buffalo Bills, the Carolina Panthers, and an XFL football team, and that all of his earnings as a professional football player were made while playing on two NFL Europe teams or in training camps.

As stated in *Larramore*:

> We acknowledge as true defendants' argument that the record does not contain direct evidence establishing to a certainty that, but for plaintiff's injury, he would have made the Panthers' active roster. However, just as the Commission is entitled to use circumstantial evidence in determining the existence of a causal link between an injury and a worker's employment, we believe the Commission is entitled to the use of circumstantial evidence here.

*Id.* at 256, 540 S.E.2d at 771. In this case, the Commission made the following pertinent findings of fact:

> 16. Subsequent to the date of his injury, while participating in practices or games for defendants, plaintiff wore a splint or thumb spica case to immobilize his left hand and wrist. Evidence was presented that other linebackers in the NFL have played while wearing splints or thumb spica casts for the hands and wrists, and as a linebacker, plaintiff continued to be able to perform all of the activities associated with that position. While his hand was in a cast it was difficult to shed blockers or tackle and when his hand was knocked around during play, it resulted in a great deal of pain. Plaintiff's injury prevented him from being able to practice or otherwise display his abilities as a deep snapper.

> 17. On September 2, 2001, plaintiff was released by defendants for the stated reason that his skills or performance had been unsatisfactory as compared with other players competing for his positions on the team's roster. Plaintiff contends that his being released by defendants was directly related to his wrist injury. The greater weight of the evidence tends to show that plaintiff would have made the team but for his wrist injury and related inability to display his abilities as a deep snapper.

The record indicates that plaintiff had been informed that the Panthers's deep snapper position was vacant and that the backup linebacker position was available. Plaintiff testified that he believed he was performing better than the other deep snappers during training camp prior to his injury. He also testified that Sam Mills ("Mills"), a position coach, informed him that he was progressing well and to " '[k]eep up the good work.' " Mills also told plaintiff it was good that he was watching film because that was the kind of thing that helped a player make the team. This testimony provided a basis upon which

the Commission could determine whether or not plaintiff would have been placed on the Panthers' roster.[1]

> While this Court may disagree with the inference which the Commission drew, the determination of whether, but for his injury, plaintiff would have continued in his employment with the Panthers is a question of fact most appropriately resolved by the Commission. . . . [W]e decline to substitute our judgment for that of the Commission[.]

*Id.* at 257, 540 S.E.2d at 772.

Next, defendants contend the Commission erroneously awarded 300 weeks of temporary partial disability benefits pursuant to N.C. Gen. Stat. § 97-30. Specifically, defendants argue plaintiff did not suffer a fractured wrist on 7 August 2001, that he did not have a permanent disability as he did not return to a doctor after November 2001, and that there is no reason why plaintiff could not look for other employment with other NFL teams.

N.C. Gen. Stat. § 97-30 (2003) states in pertinent part:

**Partial incapacity.**

> Except as otherwise provided in G.S. 97-31, where the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid, as hereinafter provided, to the injured employee during such disability, a weekly compensation equal to sixty-six and two-thirds percent (66⅔%) of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter, but not more than the amount established annually to be effective October 1 as provided in G.S. 97-29 a week, and in no case shall the period covered by such compensation be greater than 300 weeks from the date of injury. . . .

*Id.*

" ' "In order to obtain compensation under the Workers' Compensation Act, the claimant has the burden of proving the existence of his disability and its extent." ' 'Under the Workers' Compensation Act, disability is defined by a diminished capacity to earn wages, not by physical infirmity.' " *Knight v. Wal-Mart Stores,*

---

1. Defendants also argue that any testimony from the Panthers's coaches and scouts regarding plaintiff's performance, likelihood of making the Panthers's team, and any vacant positions on the team was hearsay. See *infra* for a discussion of this issue.

*Inc.*, 149 N.C. App. 1, 7, 562 S.E.2d 434, 439 (2002) (citations omitted); *see also Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (stating "disability as defined in the Act is the impairment of the injured employee's earning capacity rather than physical disablement").

The burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment, (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment, (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment, or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.

*Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457 (citations omitted).

In order to support a conclusion of disability, the Commission must find:

"(1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury."

*White v. Weyerhaeuser Co.*, 167 N.C. App. 658, 670, 606 S.E.2d 389, 398 (2005) (citation omitted).

[4] Defendants first contend plaintiff was not partially disabled because he did not seek further medical treatment after 29 November 2001. Specifically, defendants argue plaintiff neither sustained a fractured wrist nor a career-ending injury. However, as previously stated, under the Workers' Compensation Act, disability is not defined as an injury or physical infirmity, rather it is a diminished capacity to earn wages. *See Knight*, 149 N.C. App. at 7, 562 S.E.2d at 439. In this case, plaintiff has demonstrated his diminished wage earning capacity by presenting evidence that he has obtained other employment at a wage

less than that earned prior to his injury. Indeed, the record indicates that plaintiff obtained employment on a commission basis as a real estate broker in January 2002. At the time of the hearing before the Commission, plaintiff had earned approximately $2,300.00, an amount substantially less than his pre-injury wages.

[5] Defendants also argue that plaintiff's failure to return to a doctor after 29 November 2001 implies that his wrist had completely healed. Therefore, defendants argue, plaintiff could have sought employment with other NFL teams. First, defendants' argument that plaintiff had completely healed by November 2001 is not supported by the record. During the 29 November 2001 visit with Dr. Wroten, plaintiff was told that his wrist pain should subside within the next two months and, if the pain did not subside, to return to Dr. Wroten for another x-ray. Plaintiff testified that his wrist began feeling better during January and February of 2002. Around that time, plaintiff testified he began exercising, training, and lifting weights again. At the time of the hearing before the Commission in May 2002, plaintiff weighed 220 pounds and could not lift the same amount of weight post-injury as he could pre-injury. In other words, he was not as strong as he was prior to his injury and not many NFL teams would be willing to give him a tryout for a middle linebacker or deep snapper position in his post-injury condition. Prior to the injury, at the time plaintiff signed the contract with the Panthers, plaintiff weighed 247 pounds. Notwithstanding plaintiff's weight and strength loss, plaintiff's agent had sent plaintiff's bio and current weight information to all of the NFL teams, but had not received any inquiries or tryout requests regarding plaintiff.

Based upon this evidence, the Commission made the following pertinent findings of fact and conclusion of law:

32. Following his return to Texas, plaintiff looked for work but was unable to obtain other employment until approximately January 2002. At that time, plaintiff became employed on a commission basis as a real estate broker, which yielded one sale for which he had not been paid of approximately $100.00, and a second sale, which resulted in two payments of $1,100.00.

. . .

34. As the result of the compensable injury by accident, plaintiff was partially disabled from employment and was earning reduced wages when he returned to employment in January

2002. His diminished ability to earn wages is due to his disability resulting from the compensable injury by accident.

### CONCLUSIONS OF LAW

. . .

2. As the result of the compensable injury, plaintiff was partially disabled and is entitled to partial disability compensation for 300 weeks dating from August 7, 2000, the date of his initial injury by accident, at the rate of $620.00 per week, the maximum rate in effect during the year 2001. N.C. Gen. Stat. § 97-30.

Competent evidence supports these findings of fact, which in turn supports the conclusion of law that plaintiff was partially disabled.

Nonetheless, defendants contend the Commission erroneously determined plaintiff was entitled to 300 weeks of partial disability payments. "[O]nce an employee initially establishes a loss of wage-earning capacity, a presumption of 'ongoing' or 'continuing' disability arises, and the burden shifts to the employer to show that the employee is capable of earning wages." *Knight*, 149 N.C. App. at 11, 562 S.E.2d at 441. As previously stated, the evidence before the Commission demonstrated plaintiff had obtained employment at a wage less than that earned prior to his injury. Defendants have not demonstrated that plaintiff is capable of earning the same pre-injury wages post-injury. Defendants only argue that he has not tried out for any NFL teams. However, as previously stated, plaintiff was not in professional football player condition due to his injury. Due to his wrist injury, plaintiff could not train and his physicians advised against it. When plaintiff was capable of training, his agent contacted all of the NFL teams, but none of the teams were interested in plaintiff's services due to his weight and strength at that time. Therefore, defendants have not shown plaintiff is capable of earning his pre-injury wages post-injury. If defendants can make this showing in the future, they are entitled to file a motion with the Commission pursuant to N.C. Gen. Stat. § 97-47 for a modification of plaintiff's award.

[6] Although it is unnecessary for this Court to address defendants' challenge to the Commission's findings of fact that plaintiff suffered a fractured left wrist in order to resolve the issues presented on appeal, we choose to address defendants' arguments. Defendants contend that plaintiff neither suffered a fractured wrist nor a career ending injury on 7 August 2001.

In Finding of Fact 31, the Commission stated: "The greater weight of the medical evidence of record supports a finding that plaintiff sustained a fracture to his left wrist as the result of the incident occurring on August 7, 2001." This finding of fact is supported by the testimony of Dr. Prager, a specialist in orthopedic surgery and a member of the NFL's panel of neutral physicians, and Dr. Wroten. Dr. Prager opined that plaintiff "sustained a fracture to the left scaphoid" and stated "[t]he scaphoid bone is notorious for taking a long time to heal . . . ." According to Dr. Wroten's medical records, he initially assessed plaintiff on 26 September 2001 and, based upon an x-ray, believed plaintiff had a fractured scaphoid bone. After reviewing a CT scan, he opined that plaintiff had a healed scaphoid bone.

Defendants reference the medical opinions of Dr. Brian A. Howard and Dr. James Coumas, which indicate plaintiff did not sustain a fracture, for support of their argument that plaintiff neither sustained a fractured wrist or a partial disability. As previously stated by this Court: "We stress that ' "the Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." ' 'Thus, the Commission may assign more weight and credibility to certain testimony than other.' " *Allen v. Roberts Elec. Contr'rs*, 143 N.C. App. 55, 61, 546 S.E.2d 133, 138 (2001) (citations omitted). Therefore, the Commission's determination that plaintiff suffered a fractured wrist is supported by competent evidence.

**[7]** Finally, defendants contend the Commission erroneously allowed plaintiff and Rob Nelson ("Nelson"), plaintiff's agent, to testify regarding statements made by Mark Koncz ("Koncz"), the Panthers's Director of Pro Scouting, Mills, a Panthers's position coach, and Darren Simmons ("Simmons"), the Panthers's assistant special teams coach. Defendants contend those statements were hearsay and not admissible under the doctrine of apparent authority.

Under N.C. Gen. Stat. § 8C-1, Rule 801(d) (2003):

A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or *(C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship or*

(E) a statement by a coconspirator of such party during the course and in furtherance of the conspiracy.

*Id.* (emphasis added).

> [T]he extra-judicial statement or declaration of [an] alleged agent may not be given in evidence, unless (1) the fact of agency appears from other evidence, and also unless it be made to appear by other evidence that the making of such statement or declaration was (2) within the authority of the agent, or (3) as to persons dealing with the agent, within the apparent authority of the agent.
>
> When these preliminary factors have been proved by evidence *aliunde*, then evidence of extra-judicial statements of the agent, when otherwise relevant and competent, may be introduced as corroborative of other evidence, or as substantive evidence bearing on the main issue in suit as a part of the *res gestae*.

*Commercial Solvents v. Johnson*, 235 N.C. 237, 241, 69 S.E.2d 716, 719 (1952) (citations omitted).

Plaintiff testified that he had a conversation with Koncz on the day of his tryout. Koncz indicated that because the Panthers's deep snapper had retired, the deep snapper position was open and that someone coming into training camp would get that position. Koncz also informed him that the backup middle linebacker role was open. Plaintiff also testified that during training camp, Mills, the position coach, came into a room and had a brief discussion with him about his progress and told him to " '[k]eep up the good work.' " Mills also told him that it was good that he was watching extra film, that was the kind of thing that helps a person make the team, and that his performance was good thus far.

Nelson testified that Koncz and Simmons informed him that plaintiff was a good linebacker and that they believed he could fill a role with the team as a long snapper. They also informed him that the Panthers's long snapper was retiring and that they needed somebody that could play both roles, backup linebacker and long snapper. Nelson testified that Koncz convinced him that the Panthers was a good situation for plaintiff. Simmons told Nelson that plaintiff's chances were good at making the roster as a long snapper and for contributing on special teams. Based upon those conversations, arrangements were made for plaintiff to tryout with the Panthers.

Defendants contend plaintiff did not establish the preliminary factors for the admission of a statement made by an alleged agent of a party, and therefore, plaintiff's and Nelson's testimony regarding statements made by Mills, Koncz, and Simmons was inadmissible.

First, Marty Hurney ("Hurney"), the Panthers' General Manager, testified that Koncz was the Panthers's Director of Pro Scouting, and that Koncz made the initial contact with plaintiff regarding a tryout. Hurney also testified that he was not there during the tryout and that he was not even sure a tryout occurred. He also testified that although he signed plaintiff's termination notice, he did not have any contact with plaintiff regarding his termination; rather, Koncz was the person that informed plaintiff he was terminated. As to who makes the determinations regarding which players makes the Panthers's final roster, Hurney testified as follows: "The head coach basically has the final say, but it—the decision is reached by obviously a lot of communication between the personnel department, myself, the head coach and the assistant coaches."

Nelson, the president of Pro-Line Management, was plaintiff's agent. Nelson testified that he has managed approximately seventy players over the past ten years and had negotiated over fifty NFL contracts. Nelson testified that "[w]e deal with personnel guys and coaches on a regular basis to determine whether or not we think a particular team is a good fit for our client." He also testified

it's virtually crucial for us to rely on the representations made by a team when it comes to whether or not we send a client there, because obviously, that's the only representation we can rely on, are the ones that we hear from anybody on—that we believe is— you know, works for the Panthers in a role that we think is going to tell us whether or not our client has a chance to make it.

And that in my opinion, obviously, always includes the people that I've mentioned, the assistant coaches, the personnel people. Those are the people that have the authority, and they can tell us. And we—we rely on that very regularly, whether or not they think our client can make a roster, or has a good opportunity to make a roster.

Nelson further testified that scouts, personnel guys, and coaches are the authorized agents of a team "that have the authority to tell [a. player's agent] whether or not [the player] has a legitimate opportunity to make their team." As director of pro scouting, Nelson testified that he "would rely on anything Mark Koncz told me about [plaintiff]

or any other client of mine when it came to deciding whether or not I would send him to the Carolina Panthers."

Based upon the Panthers's general manager's testimony that the final roster would be determined by the head coach with input from all of the assistant coaches, the personnel department (which includes scouts), and the general manager, and Nelson's testimony that it was industry practice to rely upon the representations made by scouts and coaches regarding a player's chances of making a team, the testimony regarding what the coaches and scouts stated regarding the team's needs and plaintiff's performance was admissible. Indeed, these individuals had authority to discuss the team's needs and a player's performance as their opinion would be considered in determining the team's final roster. Moreover, Koncz, the director of pro scouting, handled all of the communication between plaintiff and the Panthers regarding vacancies on the team roster, a tryout, and termination. Mills, as the position coach, also had the authority to tell a player that it was good he was watching film and to give an assessment about how a player was progressing in practice. Accordingly, plaintiff's and Nelson's testimony regarding the statements made by Koncz, Simmons, and Mills regarding plaintiff's performance and the open deep snapper position was admissible.

## II. Plaintiff's Appeal

[8] Plaintiff presents the following issue for our consideration: Whether the Commission erroneously determined defendant was entitled to a dollar-for-dollar credit for a post-injury $35,294.00 injury grievance settlement. The application of N.C. Gen. Stat. § 97-42 in the context of a highly paid professional athlete presents an issue of first impression. Upon the injury to plaintiff that occurred during the performance of his contractual duties, he was entitled to medical care and his yearly salary during the 2001 NFL football season pursuant to his contract with the Panthers. Workers' compensation cases involving highly paid professional athletes present rare and unique issues for this Court. Unlike the typical workers' compensation cases, cases such as this usually involve complex collective bargaining agreements and individualized player contracts. Often the injured professional athlete receives compensation post-injury for which the team-employer seeks a credit under N.C. Gen. Stat. § 97-42. The credit issues arising in this context are complicated, and unlike some other states with professional teams, North Carolina does not have a statute specifically addressing highly paid professional athletes and workers' compensation.

In this case, plaintiff (I) contends the Commission's award of a dollar-for-dollar credit is not supported by the applicable statutory and case law, and (II) argues defendants were not entitled to a credit because plaintiff contributed to the fund from which the injury grievance settlement was paid. The NFL Standard Player Contract states:

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers compensation.

The Commission rendered the following pertinent findings of fact and conclusions of law regarding paragraph 10 of the player contract:

30. . . . In the case at bar, paragraph 10 of the plan (player's contract) does provide for a method other than the statutory method and states that the credit shall be the amount of the payment made under the contract. Therefore, because the plan provides for a credit based upon the payment itself, pursuant to N.C. Gen. Stat. § 97-42 the credit is not based upon the number of weeks for which plaintiff was paid, but rather defendants are entitled to a credit for the $35,294.00 settlement paid to plaintiff on a dollar-for-dollar basis.

CONCLUSIONS OF LAW

. . .

3. Defendants are entitled to a dollar-for-dollar credit for the settlement amount of $35,294.00 paid to plaintiff under the player's contract which shall be deducted from the end of the 300-week period under N.C. Gen. Stat. §§ 97-30 and 97-42. *Larramore v. Richardson Sports Ltd. Partners*, 141 N.C. App. 250, 540 S.E.2d 768 (2000), *aff'd per curiam*, 353 N.C. 520, 546 S.E.2d 87 (2001).

The Commission relied upon *Larramore*, 141 N.C. App. 250, 540 S.E.2d 768, in awarding defendants a credit in this case. In *Larramore*, however, this Court did not address the issue of whether an employer was entitled to a dollar-for-dollar credit for the amounts paid to an employee after his injury. Moreover, this Court does not even discuss a dollar-for-dollar credit in *Larramore*. The only reference to a credit in *Larramore* is in this Court's summary of the Commission's Opinion and Award. This Court stated: "The Commission calculated plaintiff's average weekly wage as $1,653.85, yielding a weekly compensation rate of $478.00, minus appropriate credits to defendants." *Id.* at 253, 540 S.E.2d at 770. Accordingly, we conclude this Court's opinion in *Larramore* does not hold an employer is entitled to a dollar-for-dollar credit for any amounts paid to an employee after his injury. Rather, this issue is governed by N.C. Gen. Stat. § 97-42 (2003).

N.C. Gen. Stat. § 97-42 provides in pertinent part that:

*Unless otherwise provided by the plan*, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.

*Id.* (emphasis added).

Typically, under N.C. Gen. Stat. § 97-42, any credit an employer receives for payments made pursuant to an employer-funded salary continuation, disability, or other income replacement plan is awarded by reducing the number of weeks of workers' compensation awarded to the claimant by the number of weeks in which an employer made

payments under the plan. However, the language "[u]nless otherwise provided by the plan" indicates an employer may include language in the wage-replacement plan that modifies N.C. Gen. Stat. § 97-42 to allow for a dollar-for-dollar credit. Defendants contend paragraph 10 of the player contract modifies the provisions of N.C. Gen. Stat. § 97-42 and allows for a dollar-for-dollar credit.

> In interpreting a contract, the court's principle objective is to determine the intent of the parties to the agreement. Generally, "[w]hen the language of a contract is plain and unambiguous then construction of the agreement is a matter of law for the court." "However if the terms of the contract are ambiguous then resort to extrinsic evidence is necessary and the question is one for the jury."

*Holshouser v. Shaner Hotel Grp. Props. One,* 134 N.C. App. 391, 397, 518 S.E.2d 17, 23 (1999) (citation omitted). The language in paragraph 10 of the player contract is unambiguous. The terms plainly state that:

> Any compensation paid to player . . . for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

Thus, the Standard Player Contract unambiguously provides for a dollar-for-dollar credit.

Plaintiff does not argue the terms of paragraph 10 are ambiguous; rather, plaintiff argues that several arbitration decisions compel a different result. In *Kyle Freeman v. Los Angeles Raiders* (December 28, 1994) and *In the Matter of Arbitration Between Miami Dolphions, Ltd. v. Smith* (April 21, 1997), an arbitrator determined paragraph 10 of the NFL Player Contract provides for an offset for time for the period of the contract and not a dollar-for-dollar credit of the claimant's post-injury payment against all indemnity payments under the workers' compensation law. While the context of these decisions were discussed during the depositions of Dennis Curran ("Curran") and Richard Berthelsen, the actual decisions were not presented to the Commission for consideration. Therefore, these decisions are not properly before us.

Finally, plaintiff argues that because the players' percentage of the gross NFL revenue was the source of funds for the injury grievance settlement, defendants were not entitled to a credit. The Commission made the following pertinent finding of fact:

27. The NFL Management Council and the NFL Players' Association differ on their interpretation of paragraph 10 of the player's contract. Dennis Curran, senior vice-president of the NFL Management Council, testified that the settlement amount was paid out of defendants' gross revenues and that therefore defendants are entitled to a credit. Mr. Curran interprets paragraph 10 to entitle defendants to a dollar-for-dollar offset for workers' compensation paid to plaintiff. Richard Berthelsen, general counsel for the NFL Players' Association, testified that since the settlement under the Injury Grievance was paid out of the players' share of gross revenues, defendants are not entitled to any credit for this payment. In the alternative Mr. Berthelsen interprets paragraph 10 not to entitle defendants to a dollar-for-dollar credit, but a credit for the number of weeks which a player is paid under paragraph 9. Mr. Berthelsen further testified that there is no requirement that a player make the team to be entitled to recover under paragraph 9.

28. The Full Commission finds that the Injury Grievance monies paid to plaintiff came from the gross revenue earned by the Panthers from professional football games. The gross revenue is put into a mathematical formula to determine the players' salary cap for each football season. Plaintiff did not contribute to the salary cap for the Panthers. The salary cap is an aggregate limit on what can be paid to the players. Individual players negotiate their own salaries, depending upon their skill and abilities. All the players' salaries and benefits on the team cannot exceed the limit mandated by the salary cap. Plaintiff was paid salary and benefits out of money that was designated as money that can be paid to players, but no percentage of his salary was put into the fund to pay for benefits. Therefore, defendants are entitled to a credit for payments "made by the employer" pursuant to N.C. Gen. Stat. § 97-42.

"[W]hen reviewing Industrial Commission decisions, appellate courts must examine 'whether *any* competent evidence supports the Commission's findings of fact and whether [those] findings . . . support the Commission's conclusions of law.'" *McRae*, 358 N.C. at 496,

597 S.E.2d at 700 (citations omitted) (emphasis added). "The findings of fact of the Industrial Commission are conclusive on appeal when supported by competent evidence, even though there [is] evidence that would support findings to the contrary." *Jones v. Desk Co.*, 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965). After careful review of the record, we conclude the testimony of Curran provided competent evidence upon which the Commission's findings of fact regarding the funding of the injury grievance settlement were based.

In sum, we conclude the Commission properly determined plaintiff suffered a compensable injury by accident arising out of and in the course of his employment. We also conclude the Commission properly determined plaintiff's average weekly wage and awarded plaintiff 300 weeks of benefits. Finally, we affirm the Commission's decision to award defendants a dollar-for-dollar credit for the $35,294.00 injury grievance settlement.

Affirmed.

Judges McGEE and LEVINSON concur.