IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-380

Filed: 5 April 2016

Greene County, No. 14 CVS 132

ALBERT BARRON, Petitioner,

v.

EASTPOINTE HUMAN SERVICES LME, Respondent.

Appeal by Respondent from an order entered 5 January 2015 by Judge Paul L. Jones in Superior Court, Greene County. Heard in the Court of Appeals 19 October 2015.

*Gray Newell Thomas, LLP, by Angela Newell Gray, for Petitioner-Appellee.*

*The Charleston Group, by Jose A. Coker, R. Jonathan Charleston, Coy E. Brewer, Jr., and Dharmi B. Tailor, for Respondent-Appellant.*

McGEE, Chief Judge.

Eastpointe Human Services LME ("Eastpointe"), appeals from an order of the trial court ("the trial court's order"), reversing the final decision of an administrative law judge ("the ALJ's decision") that held Eastpointe (1) had grounds to dismiss petitioner Albert Barron ("Mr. Barron") as an employee and (2) had given Mr. Barron sufficient notice of the reasons for his dismissal. The trial court held that Eastpointe "did not [meet] its burden of proof that it had 'just cause' to dismiss" Mr. Barron and

that the ALJ's decision was "[a]ffected by other error of law." We reverse the order of the trial court.

## I. Background

Eastpointe describes itself in its brief as

> a local political subdivision of the State of North Carolina and a managed care organization that serves twelve (12) counties in eastern North Carolina. The agency has responsibility for oversight, coordination, and monitoring of mental health, intellectual developmental disabilities, and substance use addiction services in its catchment area. Eastpointe authorizes payment of medically necessary Medicaid services for residents of the catchment area whose Medicaid originates in the Eastpointe region. Eastpointe also provides housing to a limited number of special needs consumers.

(footnotes omitted).

Eastpointe hired Mr. Barron in 2001. Mr. Barron became Eastpointe's Housing Coordinator in 2006, and his title was changed to Director of Housing when Eastpointe merged with two similar managed care organizations in 2012. As Director of Housing, Mr. Barron "provide[d] direction in the development of affordable housing for special needs populations . . . [u]nder minimal supervision of the Chief of Clinical Operations[.]"

A consumer of housing services ("Consumer") accused Mr. Barron, *inter alia*, of touching her sexually without her consent in August 2012 and also of promising her furniture if she entered into a relationship with him. Mr. Barron was subsequently placed on "Investigative Status with pay" and, after a pre-dismissal

conference, he was dismissed from employment with Eastpointe on 19 December 2012. Mr. Barron petitioned the Office of Administrative Hearings to review his dismissal by filing a "Petition for a Contested Case Hearing[.]" After a hearing, the ALJ's decision affirmed his dismissal. Mr. Barron petitioned the Superior Court of Greene County to review the ALJ's decision, and the trial court reversed the ALJ's decision. Eastpointe appeals.

## II. The Evidence

### A. Mr. Barron's Interactions with Consumer

An administrative hearing was held on 23 October 2013 and 16 January 2014 (hereinafter, "the hearing") in this matter. During the hearing, Karen Holliday ("Ms. Holliday"), a Housing Specialist with Eastpointe, testified that, in late August 2012, she asked Mr. Barron to take a copy of Consumer's lease to Consumer. Mr. Barron testified that he agreed to do so and went to Consumer's home on the morning of 24 August 2012. Mr. Barron and Consumer both testified that Consumer answered the door, informed Mr. Barron that she was not properly dressed, and asked Mr. Barron to return at a later time. Mr. Barron agreed and left.

Ms. Holliday testified she received a call from Consumer's case manager, Joy Coley ("Ms. Coley"), later that day indicating Consumer was ready for Mr. Barron to deliver her lease. Consumer testified Mr. Barron returned to her home later that day and that she was in the kitchen preparing food for her two sons. Consumer testified Mr. Barron entered her home, spoke to her sons for a while, and said "y'all have a

sexy mom[.]" In response, Consumer instructed her boys to leave the kitchen. Consumer further testified

> [Mr. Barron] got up and he came around, and he told me himself how fine and sexy I was. He asked me for a hug. I gave him a hug. . . . [H]e grabbed my buttocks and turned around and pulled his hand around and grabbed my private part, and I started backing up, and he pulled me back closer to him. He told me that if I ever told anybody that he would – he would take the house away from me that he blessed me with. . . . [H]e [also] told me basically if I started seeing him that he would make sure . . . I got furniture and that he would take care of me and my boys, [that] he would make sure that I wouldn't go without.

Mr. Barron acknowledged that, later that day, he sent Consumer some text messages that read, "H[i] [Consumer], this is Albert and this is my personal cell. It was so lovely meeting with you today . . . . [P]lease send me some of those amazing pics [your] son let me [see] on [your] phone." Consumer testified she sent Mr. Barron two pictures of herself, in which she was wearing different dresses and was posing for the camera. The texts and pictures were admitted into evidence at the hearing without objection. Mr. Barron acknowledged that Consumer sent him one picture, at his request, and that he responded by texting "Gorgeous!!!" Mr. Barron testified his response of "Gorgeous!!!" was meant "to describe something elegant or something with splendor, or something like that because, like a sunset, something like that. I use that word a lot and – to put that significance on something, yeah."

Ms. Holliday testified that Consumer called her within a couple of days of Mr. Barron's visit to Consumer's home. According to Ms. Holliday, Consumer seemed

> very upset and [was] saying that Mr. Barron . . . had been really inappropriate with her and she didn't like the fact that he had disrespected her in front of her kids. And to my recollection [Consumer said] something about living room furniture and that he had promised her living [room] furniture or something to that nature. . . . [Consumer also] state[d] at that time that Mr. Barron did touch her buttocks.

Ms. Holliday testified she met with Mr. Barron the following day and confronted him about engaging in "inappropriate behavior" with Consumer, although Ms. Holliday testified she did not go into the specifics of Consumer's allegations that were sexual in nature. Mr. Barron denied any wrongdoing. Ms. Holliday also confronted Mr. Barron about his allegedly offering Consumer furniture, which he denied. Ms. Holliday testified she did not report either of Consumer's allegations further up the chain of command because Mr. Barron was Ms. Holliday's supervisor. Regarding Consumer's allegation that Mr. Barron had offered her furniture, Mr. Barron testified he also did not report that allegation up the chain of command. Dr. Susan Corriher ("Dr. Corriher"), Eastpointe's Chief of Clinical Operations, testified that not reporting Consumer's allegations up the chain of command violated Eastpointe's Corporate Compliance Manual and Human Resources Policy and Procedure Manual.[1]

---

[1] Eastpointe's Corporate Compliance Manual states that "[i]t will be the policy of Eastpointe to take all reports of potential violations [of the law] seriously. Any such report must be directed to the Corporate Compliance Officer[.]" Eastpointe's Human Resources Policy and Procedure Manual states that, when receiving a consumer complaint that "cannot be resolved to the complainant's satisfaction without further investigation[,]"

Mr. Barron testified he received another text from Consumer in September 2012 that stated: "I wonder[ ] [what] or who scared [you] to have made [you] change [your] mind about [what] all [you] said to me [before you left] my [house] that [day]." He then received a string of texts from Consumer between 31 October and 2 November 2012, stating that Consumer had a "huge surprise" for Mr. Barron, that he "screwed up[,]" and that he messed with "the[ ] [w]rong chick." Mr. Barron contacted Dr. Corriher about the texts on 2 November 2012.

## B. The Investigation

Mr. Barron met with Dr. Corriher and Kenneth E. Jones ("Mr. Jones"), Eastpointe's Chief Executive Officer, on 5 November 2012 ("the 5 November meeting") to discuss Consumer's allegations and the events that had taken place since 24 August 2012. Dr. Corriher testified Mr. Barron acknowledged asking for and receiving a picture from Consumer and that he replied by texting: "Gorgeous!!!" According to Dr. Corriher, Mr. Barron said he did not report the texts or allegations to her earlier because "the text messages had stopped at some point, and he thought

---

staff will engage the formal complaint process. The staff who will receive the complaint will document the following information within [an Eastpointe] database:

- Date complaint received
- Complainant's name and contact information
- Relationship to the consumer (if not the consumer)
- Brief description of the nature of the complaint

. . .

This information is then immediately sent to the Customer Services Lead or designee.

it was over," and that he later reported the texts to her because Consumer had started texting him again and his attorney had advised him to do so. Dr. Corriher further testified that, during the 5 November meeting, she specifically asked Mr. Barron about Consumer's accusations that he had touched Consumer, which Mr. Barron denied.

Dr. Corriher testified that, after the 5 November meeting, she consulted with Theresa Edmondson ("Ms. Edmondson"), Eastpointe's Director of Corporate Compliance and Human Resources, and instituted an investigation into Consumer's allegations ("the investigation"). The Eastpointe staff members assigned to investigate Consumer's allegations ("the investigative team") consisted of Dr. Corriher, Ms. Edmondson, Lynn Parrish, a member of the Human Resources Department at Eastpointe, and Tashina Raynor, Eastpointe's Director of Grievance and Appeals.

Pending the results of the investigation, Mr. Barron was placed on "Investigative Status with pay" on 6 November 2012. The letter from Eastpointe notifying Mr. Barron of the change in his status ("the investigative status letter") stated, in part, that

> [t]he reports of unacceptable conduct resulting in your being placed in Investigatory Status with pay are:
>
> 1. Allegations of inappropriate relationship with a consumer[.]

2.  Not reporting these allegations to your supervisor in a timely manner.

Dr. Corriher testified about a telephone interview she had with Consumer on 26 November 2012 to discuss the allegations against Mr. Barron. Dr. Corriher documented that interview, and the statements reportedly made by Consumer during the interview were generally consistent with those reported by Ms. Holliday from her initial telephone conversation with Consumer. Mr. Barron met with the investigative team on 29 November 2012 to answer questions about Consumer's allegations ("the 29 November meeting"). According to Mr. Barron, he "was very surprised" by the questions asked during the 29 November meeting, because he thought the investigative team was investigating his concerns regarding Consumer's text messages to him. Mr. Barron submitted a four-page summary of his account of the interactions between him and Consumer to the investigative team on 30 November 2012.

C. The Pre-Dismissal Conference and Dismissal Letter

Eastpointe issued Mr. Barron a notice of pre-dismissal conference, dated 13 December 2012 ("the pre-dismissal notice"), that stated, in part,

[t]he findings of the investigative team are as follows:

1.  A consumer of housing services ("Consumer") has made accusations of inappropriate conduct by you. This accusation of inappropriate conduct included speaking [to] and touching her in an inappropriate manner, promising her living room furniture, [and]

communicating with her through text messaging on your personal cell phone.

. . .

4.   By your own admission you learned on August 29, 2012 from a co-worker that [ ] Consumer was making accusations about your inappropriate personal conduct towards her.  Further, you did not report this fact to your [supervisor] until [November] 5, 2012.

. . .

6.   Based on text messages you presented to management, you engaged in unprofessional and inappropriate communication with [ ] Consumer.

Eastpointe held a pre-dismissal conference on 17 December 2012 ("the pre-dismissal conference"), in which Mr. Barron participated.  Mr. Jones sent Mr. Barron a dismissal letter, dated 19 December 2012 ("the dismissal letter"), that stated, in part,

> our decision is to dismiss you from your position as Director of Housing effective Wednesday, December 19, 2012 at 5:00 p.m.  The basis for termination includes unacceptable personal conduct and conduct unbecoming an employee that is detrimental to the agency services.
>
> The determination was based on the following[ ]:
>
> 1. A consumer of housing services made accusations of inappropriate conduct by you.
>
> 2. You confirmed you communicated with this consumer on your personal cell phone[,] . . . [and] [i]t was determined that some of the communications were not work related or professional.

3. That you learned on August 29, 2012 from a co-worker that this consumer was making accusations about you exhibiting inappropriate personal contact towards her, but did not report this to your supervisor until [November] 5, 2012.

   . . .

6. You inappropriately asked this consumer for a picture, which was sent, and received by you.

## D. The ALJ's Decision

Mr. Barron filed a "Petition for a Contested Case Hearing" with the Office of Administrative Hearings, dated 14 January 2013. Mr. Barron alleged in his petition that Eastpointe

> has substantially prejudiced [his] rights by acting erroneously, failing to use proper procedure, and acting arbitrarily or capriciously when it suspended and ultimately terminated the petitioner for alleged unacceptable personal conduct related to a consumer's alleged accusations of inappropriate conduct. [Mr. Barron] contends that [Eastpointe] terminated him without just cause based on false accusations.

After a hearing, the ALJ, in a decision dated 22 April 2014, made numerous findings in line with Consumer's allegations and concluded that

> 33. [Mr. Barron's] willful failure to report the allegations against him until matters escalated violated known and written work rules.
>
> 34. [Mr. Barron's] personal relations and touching of Consumer [ ] were inappropriate behavior[s] that constituted unacceptable personal conduct and conduct unbecoming an employee. [Mr. Barron's] interactions and text messaging with Consumer [ ]

was "conduct unbecoming a state employee that is detrimental to state service[ ]" [under 25 N.C.A.C. 1J .0614(8).]

. . .

38. In this case, [Mr. Barron] did in fact engage in the conduct as alleged in four of the six enumerated bases in the [dismissal] letter of December 19, 2012, which constitutes unacceptable conduct as defined by [25 N.C.A.C. 1J .0614(8)]. [Eastpointe] had "just cause" for disciplining [Mr. Barron].

The ALJ's decision also noted that the dismissal letter was "inartfully" drafted but held, nonetheless, that it provided Mr. Barron with sufficient notice of the grounds for his dismissal.

## E. The Trial Court's Order

In a petition dated 16 May 2014, Mr. Barron petitioned the Superior Court of Greene County to review the ALJ's decision. Mr. Barron filed with the trial court "Petitioner's Memorandum in Support of His Petition for Judicial Review" ("the Memorandum"), dated 4 December 2014.[2] The trial court's order, entered 5 January 2015, is less than two pages in length and summarily concludes that

(2) [Eastpointe] did not [meet] its burden of proof that it had "just cause" to dismiss [Mr. Barron] for unacceptable personal conduct without warning or other disciplinary action.

___

[2] Mr. Barron's Memorandum is largely replicated, almost word for word, in his brief before this Court.

(3) The substantial rights of [Mr. Barron] were prejudiced because the ALJ's findings, inferences, conclusions, or decisions are:

   a.   Affected by other error of law;

   b.   Unsupported by substantial evidence admissible under G.S. §§150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; and,

   c.   Arbitrary, capricious, or an abuse of discretion.

(4) There is no evidence that [Mr. Barron] willfully violated any known or written work rule, engaged in conduct for which no reasonable person should expect to receive prior warnings, or conduct unbecoming a state employee that is detrimental to state service.

(5) The ALJ's decision has no rational basis in the evidence.

Accordingly, the trial court reversed the ALJ's decision.

### III.   Standard of Review

Judicial review of a final agency decision in a contested case is governed by N.C. Gen. Stat. § 150B-51 (2015). The statute "governs both trial and appellate court review" of administrative decisions. *N.C. Dept. of Correction v. Myers*, 120 N.C. App. 437, 440, 462 S.E.2d 824, 826 (1995), *aff'd per curiam*, 344 N.C. 626, 476 S.E.2d 364 (1996). Pursuant to N.C.G.S. § 150B-51(b),

> [t]he court reviewing a final decision may . . . reverse or modify the decision if the substantial rights of the petitioner[ ] may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> . . .

- 12 -

(4)    Affected by other error of law;

(5)    Unsupported by substantial evidence . . . ; or

(6)    Arbitrary, capricious, or an abuse of discretion.

When the issue for review is whether an agency decision was supported by "substantial evidence" or was "[a]rbitrary, capricious, or an abuse of discretion," this Court determines whether the trial court properly applied the "whole record" test. N.C.G.S. § 150B-51(c).  This requires

> examin[ing] all the record evidence — that which detracts from the agency's findings and conclusions as well as that which tends to support them — to determine whether there is substantial evidence to justify the agency's decision. Substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion.

*N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 660, 599 S.E.2d 888, 895 (2004) (citation and quotation marks omitted).  The trial court "may not substitute its judgment for the agency's as between two conflicting views," *id.*, and it is "bound by the findings" made below if they are "supported by competent, material, and substantial evidence in view of the entire record as submitted[,]" *Bashford v. N.C. Licensing Bd. for General Contractors*, 107 N.C. App. 462, 465, 420 S.E.2d 466, 468 (1992).

We review *de novo* the question of whether an agency decision was "[a]ffected by other error of law[.]"  N.C.G.S. § 150B-51(c); *see Skinner v. N.C. Dep't of Corr.*, 154 N.C. App. 270, 279, 572 S.E.2d 184, 191 (2002) ("[W]here the initial reviewing court

should have conducted *de novo* review, this Court will directly review the [agency's] decision under a *de novo* review standard."). "However, the *de novo* standard of review . . . [also] does not mandate that the reviewing court make new findings of fact in the case. Instead, the court, sitting in an appellate capacity, should generally defer to the administrative tribunal's 'unchallenged superiority' to make findings of fact." *Early v. County of Durham, Dep't of Soc. Servs.*, 193 N.C. App. 334, 342, 667 S.E.2d 512, 519 (2008) (citation omitted). "[W]e employ the appropriate standard of review regardless of that utilized by the reviewing trial court." *Skinner*, 154 N.C. App. at 279, 572 S.E.2d at 191.

## IV. Abandonment of Issues

As a preliminary matter, Mr. Barron contends in his brief that Eastpointe has abandoned its arguments on appeal because it did not set out formal "assignments of error" in the record or in its brief. However, the requirement that an appellant set out "assignments of error no longer exist[s] under our Rules of Appellate procedure; [it] disappeared . . . when the Rules were revised in 2009." *Bd. of Dirs. of Queens Towers Homeowners' Assoc., v. Rosenstadt*, 214 N.C. App. 162, 168, 714 S.E.2d 765, 769 (2011). Accordingly, Mr. Barron's argument is without merit.

## V. Just Cause

Eastpointe contends on appeal that the trial court erred by reversing the ALJ's decision and asserts it established just cause to dismiss Mr. Barron as an employee. Mr. Barron argued to the trial court below that the ALJ erred in concluding that

Eastpointe had established just cause to dismiss Mr. Barron. The trial court agreed with Mr. Barron, holding that the ALJ's decision was "[u]nsupported by substantial evidence[,]" "[a]rbitrary, capricious, or an abuse of discretion[,]" and that there was "no rational basis in the evidence" to establish just cause for Eastpointe's dismissal of Mr. Barron. We conclude that Eastpointe did have just cause to terminate Mr. Barron.

N.C. Gen. Stat. § 126-35(a) (2015) provides that "[n]o career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." Establishing just cause "requires two separate inquiries: first, whether the employee engaged in the conduct the employer alleges, and second, whether that conduct constitutes just cause for the disciplinary action taken." *Carroll*, 358 N.C. at 665, 599 S.E.2d at 898 (citation, quotation marks, and brackets omitted). "[T]he first of these inquiries is a question of fact . . . [and is] reviewed under the whole record test. . . . [T]he latter inquiry is a question of law . . . [and] is reviewed *de novo*. *Id.* at 665–66, 599 S.E.2d at 898; s*ee* N.C.G.S. § 150B-51(c).

Just cause includes "unacceptable personal conduct" by an employee. 25 N.C.A.C. 1J .0604(b). Unacceptable personal conduct is defined, in part, as

> (a)  conduct for which no reasonable person should expect to receive prior warning;
>
> . . .

(d)   the willful violation of known or written work rules; [or]

(e)   conduct unbecoming a state employee that is detrimental to state service[.]

25 N.C.A.C. 1J .0614(8).

Based on the testimony of Consumer, Ms. Holliday, Dr. Corriher, and even Mr. Barron – all of which is outlined above – as well as the pictures and texts that were admitted into evidence, there was "competent, material, and substantial evidence[,]" *See Bashford*, 107 N.C. App. at 465, 420 S.E.2d at 468 – if not compelling evidence – that Mr. Barron (1) touched Consumer sexually without her consent; (2) engaged in inappropriate text messaging with Consumer; and (3) failed to report at least some of Consumer's allegations against him until matters escalated. *Id.* Accordingly, the trial court erred by concluding that the ALJ's decision was "[u]nsupported by substantial evidence[,]" "[a]rbitrary, capricious, or an abuse of discretion[,]" and that there was "no rational basis in the evidence" for Eastpointe to dismiss Mr. Barron for just cause.

VI.   Alleged Due Process Violations During the Investigation

Eastpointe contends the trial court erred by reversing the ALJ's decision and asserts that Mr. Barron did not establish that his due process rights were violated during the investigation. Mr. Barron argued to the trial court that his due process rights had been violated during the investigation, and that, therefore, the ALJ's decision should have been reversed because (1) Dr. Corriher allegedly headed up the

investigation and was biased against him after speaking with Consumer; (2) Eastpointe's investigative team was made up of an "untrained, inexperienced group of females . . . [who] showed bias against" him during the investigation; and (3) he was "subjected to a 'hearing' without proper notice" while the investigation was ongoing. We conclude that Mr. Barron did not establish that his due process rights were violated during the investigation.

Career state employees are "entitled to a hearing according with principles of due process" before being dismissed from their jobs. *See Crump v. Bd. of Education*, 326 N.C. 603, 614, 392 S.E.2d 579, 584 (1990). "To make out a due process claim based on [bias], an employee must show that the decision-making board or individual possesses a disqualifying personal bias." *See Kea v. Department of Health & Human Sevs.*, 153 N.C. App. 595, 605, 570 S.E.2d 919, 925 (2002), *aff'd per curiam,* 357 N.C. 654, 588 S.E.2d 467 (2003). "The mere fact [that the person who ultimately recommends the dismissal of an employee] was familiar with the facts of [the employee's] case and acted as investigator and adjudicator on the matter is not a *per se* violation of due process." *Id.* at 605, 570 S.E.2d at 926. That person may "reach[ ] conclusions concerning [the employee's] situation prior to the [pre-dismissal] conference" when those conclusions are "based on" facts obtained during a thorough investigation. *Id.* at 606, 570 S.E.2d at 926.

A. Dr. Corriher's Role in the Investigation

In the present case, Mr. Barron argued to the trial court that Dr. Corriher, his direct supervisor, headed up the investigation and was biased against him after speaking to Consumer. Mr. Barron also argued that Dr. Corriher was the one who ultimately recommended that he be dismissed.[3] However, Mr. Barron made no attempt to distinguish *Kea* from the present case. As in *Kea*, "[t]he mere fact [that Dr. Corriher] was familiar with the facts of [Mr. Barron's] case and acted as investigator and[,] [perhaps to some extent,] adjudicator on the matter [was] not a *per se* violation of due process." *See id.* at 605, 570 S.E.2d at 926. Even assuming *arguendo* that Dr. Corriher may have come to certain conclusions about Mr. Barron's situation before his pre-dismissal conference, Mr. Barron does not assert that those conclusions were "based on" anything other than the facts Dr. Corriher learned during her investigation. *See id.* at 606, 570 S.E.2d at 926. Accordingly, Mr. Barron had not demonstrated that Dr. Corriher's fulfilling her role on the investigative team and possibly recommending his dismissal demonstrated that she "possesse[d] a disqualifying personal bias" in any way. *See id.* at 605, 570 S.E.2d at 925.

---

[3] However, both Dr. Corriher and Mr. Barron acknowledged at the hearing that the final decision to actually dismiss Mr. Barron was made by Mr. Jones, Eastpointe's CEO. Also, notably, when asked during the hearing whether Mr. Barron knew if "the recommendation made for [his] termination [came] from Dr. Corriher [or] Theresa Edmondson[,]" Mr. Barron replied: "Not to my knowledge."

## B. The Investigative Team

Mr. Barron also argued to the trial court that Eastpointe's investigative team was made up of an "untrained, inexperienced group of females . . . [who] showed bias against" him during the investigation. As a preliminary matter, it is unclear to this Court as to who at Eastpointe – other than Dr. Corriher, Eastpointe's Chief of Clinical Operations; Ms. Edmiston, Eastpointe's Director of Corporate Compliance and Human Resources; and Tashina Raynor, Eastpointe's Director of Grievance and Appeals – would have been *more* qualified to oversee the investigation in the present case. Notably, Mr. Barron has been silent on that point.

We also do not believe that the investigative team consisting of a "group of females" necessarily establishes bias in the present case. Mr. Barron presented no evidence at the hearing that the investigative team used gender-charged language during the investigation or otherwise showed that the team members' interactions with Mr. Barron during the investigation were informed by anything beyond the facts of the investigation. A person's gender does not equate to having a disqualifying personal bias. Without more, Mr. Barron had not established that the investigative team "possesse[d] a disqualifying personal bias" in any way. *See id.*

## C. The 29 November Meeting

Mr. Barron further argued to the trial court that his due process rights were violated when he met with the investigative team during the 29 November meeting to answer questions about the situation involving Consumer. Notably, Mr. Barron

raised no challenge with the trial court regarding his pre-dismissal conference, or the notice thereof. Instead, Mr. Barron contended his due process rights were violated when he was "subjected to a 'hearing' without proper notice" when he met with the investigative team during the 29 November meeting, *prior* to the pre-dismissal conference and while the investigation was still ongoing.

However, at the hearing, Mr. Barron testified that Dr. Corriher did, in fact, notify him of the 29 November meeting and informed him that the purpose of the meeting was for the investigative team to "hear [his] side" of the situation with Consumer. Moreover, Mr. Barron has never contended that he was deprived of a proper pre-dismissal conference before being dismissed from his job. Although Mr. Barron cited authority in the Memorandum, and in his brief before this Court, holding generally that career state employees are "entitled to a hearing according with principles of due process" *before being dismissed* from their jobs, *see, e.g.*, *Crump*, 326 N.C. at 614, 392 S.E.2d at 584, he has provided no further authority or substantive argument suggesting that the 29 November meeting constituted an additional "hearing" that similarly implicated his due process rights. *See id.* Mr. Barron's argument was without merit.

VII.  Notice of Reasons for Dismissal

Eastpointe contends on appeal that the trial court erred by reversing the ALJ's decision and asserts it gave Mr. Barron sufficient notice of the reasons for his dismissal. Mr. Barron argued to the trial court that the ALJ's decision affirming his

dismissal from Eastpointe was affected by an error of law because he was given insufficient notice of the reasons for his dismissal.

In addition to providing that career state employees may only be discharged for just cause, N.C.G.S. § 126-35(a) requires that

> [i]n cases of such disciplinary action, the employee shall, before the action is taken, be furnished with a statement in writing setting forth the specific acts or omissions that are the reasons for the disciplinary action and the employee's appeal rights.

N.C.G.S § 126-35(a). N.C.G.S § 126-35(a) "establishes a condition precedent that must be fulfilled by the employer before disciplinary actions are taken." *Leiphart v. N.C. School of the Arts*, 80 N.C. App. 339, 350, 342 S.E.2d 914, 922 (1986).

> The purpose of [N.C.G.S. §] 126-35 is to provide the employee with a written statement of the reasons for his discharge so that the employee may effectively appeal his discharge. The statute [also] was designed to prevent the employer from summarily discharging an employee and then searching for justifiable reasons for the dismissal.

*Id.* at 350–51, 342 S.E.2d at 922 (citation omitted). The written notice must be stated "with sufficient particularity so that the discharged employee will know precisely what acts or omissions were the basis of his discharge." *Employment Security Comm. v. Wells*, 50 N.C. App. 389, 393, 274 S.E.2d 256, 259 (1981).

The legal question of whether a dismissal letter is "*sufficiently* particular[,]" *id.* (emphasis added), has always been fact-specific. In *Wells*, 50 N.C. App. at 389, 274 S.E.2d at 257 (1981), the employee was "suspended . . . from his job without pay

pending an investigation into allegations that [the employee had] violated laws and petitioner's policies in the performance of his duties." The employee was subsequently fired and provided a dismissal letter, stating that the reasons for dismissal were that the employee:

1. Violated Agency Procedure in attempting to recruit workers from Florida by phone and personal visit.

2. Required growers to use crew leaders even though workers were not a part of a crew nor did the crew leader provide any service for his fee.

3. Forced workers to work for designated crew leader even though the workers preferred not to work in a crew. Workers who questioned assignment to a crew were threatened with loss of job or deportation.

4. Violated Agency Procedure by not reporting illegal aliens.

*Id.* at 392–93, 274 S.E.2d at 258–59. "[T]he only information given the [employee] concerning the reasons for his dismissal was contained in [that] letter of dismissal." *Id.* at 392, 274 S.E.2d at 258. Moreover, the employee subsequently "requested specific details regarding the four reasons for the dismissal . . . [and] asked for dates and the names of the individuals involved in these incidents." *Id.* at 393, 274 S.E.2d at 259. The state refused to provide the employee with that information. *Id.* Accordingly, this Court noted that the dismissal letter gave the employee "no way . . . to locate [the] alleged violations in time or place, or to connect them with any person

or group of persons" and held that the employee received insufficient notice in the dismissal letter under N.C.G.S. § 126-35(a). *Id.* at 393, 274 S.E.2d at 259.

Similarly, in *Owen v. UNC-G Physical Plant*, 121 N.C. App. 682, 684, 468 S.E.2d 813, 815 (1996), an employee was accused of making race-based and sex-based derogatory comments to a number of her fellow employees. She also was accused of "intimidat[ing] [other] employees and threaten[ing] reprisals if they persisted in complaining about [her] conduct." *Id.* Although the employee was given a pre-dismissal conference, the dismissal letter "fail[ed] to include the specific names of [the employee's numerous] *accusers* in her dismissal letter[.]" *Id.* at 687, 468 S.E.2d at 817 (emphasis added). Specifically, the employee's dismissal letter stated the following grounds for dismissal:

> First, I have found that while employees were working on a concrete job outside of Jackson Library in the last part of June you told a black employee, "If I was a black man, I would like to do this kind of work all day long." This statement . . . was a racial, and sex-based slur . . . [and] is especially serious because it is a message to employees, from their supervisor, that work in the Grounds Division is assigned based on race and sex. . . . On other occasions, you have made comments such as "no man will ever meet my standards" and you have called employees "stupid."
>
> Second, after learning that employees had complained to the management and to Human Resources about your conduct, you began to talk with employees to discourage pursuit of their complaints. Specifically, you distributed to three employees copies of discipline and notes about discipline you received last August. . . . You have also told employees, "If I go, I will take others with me." Such statements and actions constitute attempts to intimidate

> employees and threatened reprisals if they persisted in complaining about your conduct.

*Id.* at 684, 468 S.E.2d at 815. Based on the facts in *Owen*, this Court concluded the employee "was unable, at least initially, to correctly locate in 'time or place' the conduct which [the employer] cited as justification for her dismissal." *Id.* at 687, 468 S.E.2d at 817. Accordingly, we held that the employee's dismissal letter lacked "sufficient particularity . . . [and, therefore,] render[ed] the statement of reasons contained in the dismissal letter statutorily infirm" under N.C.G.S. § 126-35(a). *Id.* at 687–88, 468 S.E.2d at 817.[4]

However, in *Leiphart*, 80 N.C. App. at 351, 342 S.E.2d at 923, the employee was dismissed for "personal misconduct[.]" Specifically, the employee's dismissal letter stated that the employee was dismissed for a single act: his "leadership role in

---

[4] Mr. Barron also relies heavily on *Leak v. N.C. Dep't of Pub. Instruction*, 176 N.C. App. 190, 625 S.E.2d 918 (2006) (unpublished), in his brief to support his position that the dismissal letter provided insufficient notice of the reasons for his dismissal. However, unpublished cases, such as *Leak*, are reported pursuant to Rule 30(e) of the North Carolina Rules of Appellate Procedure. As noted by *Evans v. Conwood, LLC*, 199 N.C. App. 480, 490–91, 681 S.E.2d 833, 840 (2009),

> [t]his rule provides that citation of unpublished opinions is disfavored. Such an opinion may be cited if a party believes that it has precedential value to a material issue in the case, and there is no published opinion that would serve as well. When an unpublished opinion is cited, counsel must do two things: (1) they must indicate the opinion's unpublished status; and (2) they must serve a copy of the opinion on all other parties to the case and on the court.

*Id.* (citation and quotation marks omitted). In the present case, counsel did neither of these things. "This conduct was a violation of the Rules of Appellate Procedure. In our discretion, we hold that this conduct was not a gross violation of the Rules of Appellate Procedure meriting the imposition of sanctions. However, counsel is admonished to exercise greater care in the future citation of unpublished opinions." *See id.*

assembling the meeting of October [21], 1983, in [his supervisor's] office. . . ." *Id.* We held that the dismissal letter's notice of this single, specific act was "sufficient[ly] particular[ ]" and that the employee "was clearly notified of the specific act which led to his dismissal." *Id.* at 351–52, 342 S.E.2d at 923.

In *Nix v. Dept. of Administration*, 106 N.C. App. 664, 667, 417 S.E.2d 823, 826 (1992), the employee's dismissal letter stated generally that he "was being terminated because he 'had not been performing at the level expected by [his] position classification,' [ ] because there had been no 'marked improvement' " in his job performance, and because he had exhausted his vacation and sick leave. The employee also had received previous "oral and . . . written warnings" for his unacceptable performance. *Id.* Accordingly, we held that the dismissal letter was "sufficiently specific[,] . . . since [the employee] was already on notice due to the previous two warnings that he was not performing at the expected level." *Id.* (citing *Leiphart*, 80 N.C. App. at 351, 342 S.E.2d at 922); *accord Skinner*, 154 N.C. App. at 280, 572 S.E.2d at 191 (affirming an employee's demotion where "he received two detailed written warning letters, as well as a notice of the pre-demotion conference outlining the specific grounds for the proposed disciplinary action.").

In *Mankes v. N.C. State Educ. Assistance Auth.*, 191 N.C. App. 611, 664 S.E.2d 79, slip op. at 6 (2008) (unpublished), the employee was dismissed for "unacceptable

personal conduct as well as unsatisfactory performance" in her job. Her dismissal

letter stated the following grounds for dismissal:

> (1) Not following designated procedures regarding the prohibition of printing and photocopying of borrower computer records, and the resulting[ ] improper use of those hardcopy records.
>
> (2) Not working your assigned tickler accounts accurately.
>
> (3) Not making adequate, documented telephone calls to borrowers.
>
> (4) Improperly working borrower accounts that have not been assigned to you.
>
> (5) Not following designated procedures regarding letter requests for borrowers applying for total and permanent disability discharges.
>
> (6) Not following designated procedures regarding the prohibition against the recording of borrower Social Security Numbers in your personal, unauthorized work journal.

*Id.*, slip op. at 6–7. On appeal, the employee argued that the grounds stated in her

dismissal letter were "vague criticisms" and, therefore, were not "sufficiently

particular" for the purposes of N.C.G.S. § 126-35(a) under this Court's holdings in

*Wells* and *Owen*. *Id.*, slip op. at 7–8. This Court concluded, however, that *Wells* and

*Owen* were distinguishable from *Mankes*. *Id.* With regard to *Wells*, we noted that

> the *only* notice the employee had as to the reasons for his dismissal were those in the letter; he received no earlier written or oral notice of the unacceptable conduct. Second, the employee in *Wells* requested that such specific

information be provided, and the state refused to provide it. In the case at hand, petitioner was given notice both in writing and orally prior to this letter of dismissal, and specific instances of the complained-of conduct were provided at an earlier meeting.

*Id.* (citations omitted). With regard to *Owen*, we noted that

both [grounds for dismissal in the employee's dismissal letter] made reference to accusations made by "employees": "[E]mployees had complained[,]" "you began to talk with employees[,]" "[y]ou have also told employees," "attempts to intimidate employees[,]" etc. This Court noted that "not a single allegation specifically named her accuser[,]" preventing her from identifying the incidents at issue, and therefore from preparing an appropriate defense. There, however, the only reasons justifying the employee's dismissal related to her conduct toward other employees; *the identity of those individuals was therefore a vital piece of information.* In the case at hand, the reasons given for petitioner's dismissal were her own conduct, specific examples of which were given to petitioner by [her supervisor].

*Id.*, slip op. at 8 (citations omitted) (emphasis added). Accordingly, we held that the

employee received sufficient notice of the reasons for her dismissal under N.C.G.S. §

126-35(a). *Id.*, slip op. at 8–9.

Finally, in *Follum v. N.C. State Univ.*, 204 N.C. App. 369, 696 S.E.2d 203, slip

op. at 11–12 (2010) (unpublished), an employee's dismissal letter stated that the

employee "behaved inappropriately [at a 7 March 2007 meeting,] . . . refused to allow

the participants – including the dean of the school – to collaborate during the

meeting[,] . . . [and was] disrespectful by repeatedly interrupting others, not allowing

attendees to complete their statements and dismissing advice that was offered." The

employee contested his dismissal and – relying on this Court's holding in *Wells* – contended his "letter of dismissal did not allege specific acts or omissions" that formed the basis for his dismissal. *Id.*, slip op. at 10 (quotation marks omitted). On appeal, we held the employee's dismissal letter satisfied the notice requirements of N.C.G.S. § 126-35(a), in part, because the dismissal letter "identified [the employee's] conduct toward a small group of people in attendance on a specific date at a particular meeting." *Id.*, slip op. at 12.

In the present case, some of the stated grounds for Mr. Barron's dismissal are more analogous to *Leiphart*, *Nix*, *Mankes*, and *Follum* than they are to *Wells* and *Owen*. The record shows that Dr. Corriher discussed with Mr. Barron the nature of *all* of the allegations against him multiple times and that Mr. Barron participated in the 29 November meeting and in his pre-dismissal conference. The investigative status letter given to Mr. Barron stated, in part, that

> [t]he reports of unacceptable conduct resulting in your being placed in Investigatory Status with pay are:
>
> 1.  Allegations of inappropriate relationship with a consumer[.]
>
> 2.  Not reporting these allegations to your supervisor in a timely manner.

Mr. Barron's pre-dismissal notice stated that

> [t]he findings of the investigative team [were] as follows:
>
> 1.  A consumer of housing services ("Consumer") has made accusations of inappropriate conduct by you.

> This accusation of inappropriate conduct included speaking [to] and touching her in an inappropriate manner, promising her living room furniture, [and] communicating with her through text messaging on your personal cell phone.
>
> . . .
>
> 4. By your own admission you learned on August 29, 2012 from a co-worker that [ ] Consumer was making accusations about your inappropriate personal conduct towards her. Further, you did not report this fact to your [supervisor] until [November] 5, 2012.
>
> . . .
>
> **6.** Based on text messages you presented to management, you engaged in unprofessional and inappropriate communication with [ ] Consumer.

Mr. Barron's dismissal letter stated that the grounds for his dismissal were as follows:

> 1. A consumer of housing services made accusations of inappropriate conduct by you.
>
> 2. You confirmed you communicated with this consumer on your personal cell phone[,] . . . [and] [i]t was determined that some of the communications were not work related or professional.
>
> 3. That you learned on August 29, 2012 from a co-worker that this consumer was making accusations about you exhibiting inappropriate personal contact towards her, but did not report this to your supervisor until [November] 5, 2012.
>
> . . .
>
> 6. You inappropriately asked this consumer for a picture, which was sent, and received by you.

Regarding ground 2 in the dismissal letter, it was Mr. Barron who first reported the text message communications to Dr. Corriher and then delivered them during the 5 November meeting. Unlike in *Wells*, he was given numerous forms of written and oral notice pertaining to the troubling nature of those text messages before being dismissed; he participated in Eastpointe's month-and-a-half-long investigation into, *inter alia*, the nature of those text messages; and he fully participated in his pre-dismissal conference, during which all of the grounds that were to be in the dismissal letter were discussed – and all of which centered on a single chain of events between Mr. Barron and Consumer. *Cf. Leiphart*, 80 N.C. App. at 351, 342 S.E.2d at 923; *Follum*, slip op. at 11–12. Ground 2, specifically, states that Mr. Barron "confirmed" he communicated with a consumer on his personal phone and that "[i]t was determined that some of the communications were not work related or professional." Mr. Barron's pre-dismissal notice further reveals that some of those communications were "text messages" that Mr. Barron provided himself. As in *Leiphart, Mankes* and *Fullum*, ground 2 is not based on broad accusations by numerous employees, as it was in *Owen*, but rather on determining the inappropriateness of Mr. Barron's "own conduct" to which Mr. Barron has admitted. *See Mankes*, slip op. at 8; *see also Leiphart*, 80 N.C. App. at 351, 342 S.E.2d at 923; *Follum*, slip op. at 11–12.

Although this Court has held previously that the notice requirements of N.C.G.S. § 126-35(a) are generally "prophylactic" in nature, *see Owen*, 121 N.C. App. at 687, 468 S.E.2d at 817, Mr. Barron's proffered reading of N.C.G.S. § 126-35(a) would "exalt form over substance[,]" *see White v. Weyerhaeuser Co.*, 167 N.C. App. 658, 667, 606 S.E.2d 389, 396 (2005). In light of the robust defense Mr. Barron has been able to wage at all points since his dismissal, his full participation in the investigation, the numerous instances of oral and written notice provided to Mr. Barron, the isolated nature of the allegation, and given that the language in ground 2 is limited to determining the inappropriate nature of specific conduct admitted to by Mr. Barron, it would "strain credulity[,]" *State v. Locklear*, 7 N.C. App. 493, 496, 172 S.E.2d 924, 927 (1970), for this Court to hold that ground 2 was not "described with *sufficient* particularity" so that Mr. Barron would "know precisely what acts or omissions were the basis of his discharge" upon receipt of his dismissal letter. *See Wells*, 50 N.C. App. at 393, 274 S.E.2d at 259 (emphasis added); *see also Nix*, 106 N.C. App. at 667, 417 S.E.2d at 826; *Leiphart*, 80 N.C. App. at 350–51, 342 S.E.2d at 922 ("The purpose of [N.C.G.S. §] 126-35 is to provide the employee with a written statement of the reasons for his discharge *so that the employee may effectively appeal his discharge . . .* [and so] the employer [cannot] summarily discharg[e] an employee and then *search*[ ] for justifiable reasons for the dismissal." (emphasis added)); *Mankes*, slip op. at 8; *Follum*, slip op. at 11–12. Mr. Barron "was clearly notified of

the specific act[s] which led to his dismissal . . . [under ground 2, and] [h]e is entitled to no relief on this basis." *See Leiphart*, 80 N.C. App. at 352, 342 S.E.2d at 923.

Similarly, ground 3 in the dismissal letter states that Mr. Barron "learned on August 29, 2012 from a co-worker that [a] consumer was making accusations about [him] exhibiting inappropriate personal contact towards her, but did not report this to [his] supervisor until [November] 5, 2012." We find this analogous to some of the stated grounds for dismissal in *Mankes* – that the employee was "[n]ot following designated procedures[.]" *Mankes*, slip op. at 6–7. Eastpointe had specific, written procedures for handling *any* consumer complaints that could not be immediately resolved; those procedures required formal documentation of the complaint and reporting it up the chain of command. *See supra*, footnote 2. Mr. Barron has never disputed that he became aware on 29 August 2012 of an unresolved complaint by Consumer regarding his conduct towards her and that he did not report that complaint to Dr. Corriher, his only direct "supervisor[,]" let alone anyone else, for over two months.[5] For similar reasons stated above, we find that ground 3 in Mr. Barron's dismissal letter also provided him notice of "sufficient particularity . . . of the specific

---

[5] Mr. Barron's job description in the record expressly states that Dr. Corriher was Mr. Barron's only direct supervisor and provides that the role of Eastpointe's Housing Director was to "provide[ ] direction in the development of affordable housing for special needs populations . . . [u]nder minimal supervision of the Chief of Clinical Operations[.]"

act [or omission] which led to his dismissal" on that ground. *See Leiphart*, 80 N.C. App. at 351–52, 342 S.E.2d at 923.[6]

For all the foregoing reasons, we believe that the present case is distinguishable from *Wells* and *Owen* and analogous to *Leiphart*, *Nix*, *Mankes*, and *Follum*, particularly with respect to grounds 2 and 3 in Mr. Barron's dismissal letter. Because Mr. Barron received sufficient notice under N.C.G.S. § 126-35(a) as to those grounds for his dismissal from Eastpointe, the order of the trial court is reversed.

REVERSED.

Judges ELMORE and INMAN concur.

---

[6] Because we hold that Mr. Barron received sufficient notice of the reasons for his dismissal under grounds 2 and 3 in the dismissal letter, and we believe those grounds provided Eastpointe with sufficient just cause to dismiss Mr. Barron, we need not review whether Mr. Barron received sufficient notice under grounds 1 and 6 in the dismissal letter. *See generally* 25 N.C.A.C. 1J .0614(8) (defining "[u]nacceptable [p]ersonal [c]onduct" that establishes just cause for dismissal as "conduct for which no reasonable person should expect to receive prior warning; . . . the willful violation of known or written work rules; . . . [or] conduct unbecoming a state employee that is detrimental to state service[.]").