McGEE, Chief Judge, concurring in part and dissenting in part.
I concur in the majority's conclusion that an "administrative law judge, reviewing an agency's decision to discipline a career state employee ... owes no deference to the agency's conclusion of law that *111 ... just cause existed" for the action taken by the agency. I also agree that "[a]fter receiving and considering the evidence, and entering findings of fact, an administrative law judge is free to substitute their judgment for that of the agency as to the legal conclusion of whether just cause ... existed for the agency's action." However, I respectfully dissent from the majority's assertion that the standards of review provided in N.C. Gen. Stat. § 150B-51 apply to this case. I further dissent from the majority's conclusion, in its application of the three-prong "just cause" analysis created by this Court in Warren v. N.C. Dep't of Crime Control , 221 N.C. App 376, 726 S.E.2d 920, disc. review denied , 366 N.C. 408, 735 S.E.2d 175 (2012), that Petitioner's actions in the present case did not give rise to just cause for his termination-the disciplinary action chosen by the agency.
I. Changes in the Just Cause Statutory Framework
The present case is the first time this Court has interpreted the changes made to the statutory scheme for determining when just cause exists for an agency's disciplinary decision. See generally 2013 N.C. Sess. Laws ch. 382 ("the 2013 amendment"). The most significant change made by the 2013 amendment was to alter the role of the ALJ in the just cause determination process. Under the former statutory framework, an ALJ provided a "recommended decision," complete with findings of facts and conclusions of law, before entry of a final agency action. See N.C. Dep't of Env't & Natural Res. v. Carroll , 358 N.C. 649, 657-58, 599 S.E.2d 888, 893-94 (2004). Through the 2013 amendment, the General Assembly created N.C. Gen. Stat. §§ 126-34.01 and 126-34.02, and in doing so significantly shifted the role of the ALJ in the just cause determination process. A contested case hearing is now initiated in the Office of Administrative Hearings "[o]nce a final agency decision has been issued[.]" N.C. Gen. Stat. § 126-34.02(a) (2015). N.C. Gen. Stat. § 126-34.02 currently allows the ALJ to review an agency decision to terminate the employment of a career State employee under the following relevant circumstances:
(b) The following issues may be heard as contested cases after completion of the agency grievance procedure and the Office of State Human Resources review:
....
(3) Just cause for dismissal, demotion, or suspension.-A career State employee may allege that he or she was dismissed, demoted, or suspended for disciplinary reasons without just cause.
*112 N.C. Gen. Stat. § 126-34.02(b)(3) (2015). The language of N.C. Gen. Stat. § 126-34.02(b)(3) allows a State employee to initiate a contested case in the Office of Administrative Hearings to review whether just cause existed to dismiss, demote, or suspend that employee. Id. There is nothing in the language of N.C.G.S. § 126-34.02(b)(3) to indicate that a career state employee may initiate a contested case to argue that he should have received a lesser disciplinary action, although just *140 cause existed for the disciplinary action received.
Further, N.C. Gen. Stat. § 126-34.02(a) limits the Office of Administrative Hearings to the following relief when it has determined that the final agency decision was erroneous:
Once a final agency decision has been issued in accordance with G.S. 126-34.01, ... a State employee, or former State employee may file a contested case in the Office of Administrative Hearings under Article 3 of Chapter 150B of the General Statutes.... In deciding cases under this section, the Office of Administrative Hearings may grant the following relief:
(1) Reinstate any employee to the position from which the employee has been removed.
(2) Order the employment, promotion, transfer, or salary adjustment of any individual to whom it has been wrongfully denied.
(3) Direct other suitable action to correct the abuse which may include the requirement of payment for any loss of salary which has resulted from the improper action of the appointing authority.
N.C. Gen. Stat. § 126-34.02 (2015). N.C. Gen. Stat. § 126-34.02(a)(2) is not relevant to the issue before us. N.C. Gen. Stat. § 126-34.02(a)(1) authorizes reinstatement of an employee if the ALJ in a contested case hearing determines that there was no just cause to terminate the employee. N.C.G.S. § 126-34.02(a)(1) does not specifically authorize the ALJ to grant any relief other than reinstatement if it determines that dismissal was not supported by just cause. N.C. Gen. Stat. § 126-34.02(a)(3) allows the ALJ to take other suitable action that may include actions not specifically mentioned in the statute, but only "to correct the abuse [or the 'improper action of the appointing authority']." Id. In other words, N.C.G.S. § 126-34.02(a)(3) only applies if the ALJ had determined that the final agency decision was erroneous. In the case before us, the ALJ could *113 only invoke his or her powers pursuant to N.C.G.S. § 126-34.02(a)(3) if it first determined there was no just cause for the termination of Petitioner's employment.[1]
In short, the Office of Administrative Hearings is authorized by N.C.G.S. § 126-34.02 to take action in a contested case if it has first determined that the actual discipline included in the final agency decision was not supported by just cause. If the ALJ determines that there was just cause to support the final agency decision, it lacks authority to do anything other than affirm that decision.
While the majority principally cites and quotes from N.C.G.S. § 126-34.02, the majority simultaneously concludes that N.C. Gen. Stat. § 150B-51 "governs the scope and standard of review of this Court's review of an administrative agency's final decision," and that "[t]he standard of review is dictated by the substantive nature of each assignment of error." (citations omitted). I disagree with any reliance the majority places on N.C.G.S. § 150B-51, a separate statutory framework which is, in my view, inapplicable to the present case. N.C.G.S. § 150B-51, a part of Article 4 of Chapter 150B of the General Statutes, is entitled "Judicial Review" and allows "[t]he court reviewing a final decision" of an ALJ to reverse or modify that decision under certain circumstances and under various standards of review. See N.C. Gen. Stat. §§ 150B-51(b)(1)-(6) (2015). N.C. Gen. Stat. § 150B-43, another statute in Article 4, describes when the procedure provided by Article 4 of Chapter 150B governs judicial review of an ALJ's decision, and when it does not:
Any party or person aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to the party or person aggrieved by statute or agency rule, is entitled to judicial review of the decision under this Article, unless adequate procedure for judicial review is provided by another *141 statute, in which case the review shall be under such other statute .
N.C. Gen. Stat. § 150B-43 (2015) (emphasis added).
The procedure in Article 4 of Chapter 150B, including the standards of review in N.C.G.S. § 150B-51, are inapplicable because *114 N.C.G.S. § 126-34.02, which states that "[a]n aggrieved party in a contested case under this section shall be entitled to judicial review of a final decision by appeal to the Court of Appeals," serves as "another statute" which provides an "adequate procedure for judicial review" and thereby renders N.C.G.S. §§ 150B-43 through 150B-52 not relevant. This view is reinforced by reading N.C.G.S. § 126-34.02, which provides judicial review directly to the Court of Appeals, in pari materia with N.C.G.S. § 150B-45, which provides that, under the procedures set out in Article 4 of Chapter 150B, judicial review is undertaken first in superior court. See N.C. Gen. Stat. § 150B-45 (2015) ("To obtain judicial review of a final decision under [Article 4 of Chapter 150B], the person seeking review must file ... [a] petition for review ... in the superior court[.]"). Both statutes cannot control judicial review of contested case hearings of this nature, and because N.C.G.S. § 126-34.02 was specifically enacted to provide for judicial review directly to this Court, I find it to be the "adequate procedure for judicial review" contemplated by N.C.G.S. § 150B-43. Therefore, the statutory procedure set forth in Article 4 of Chapter 150B, including the standards of review in N.C.G.S. § 150B-51, are inapplicable.[2] I dissent from the majority's conclusion, to the extent that it holds that the standards of review contained in N.C.G.S. § 150B-51 are applicable to this case.
II. Warren Analysis: Just Cause for Petitioner's Termination
N.C. Gen. Stat. § 126-35(a) provides: "No career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause.... The State Human Resources Commission may adopt, subject to the approval of the Governor, rules that define just cause." N.C. Gen. Stat. § 126-35(a) (2015). Exercising that delegated authority, the State Human Resources Commission has adopted rules, codified in the North Carolina Administrative Code, that define just cause for disciplinary action: "Either unsatisfactory or grossly inefficient job performance or unacceptable personal conduct as defined in 25 NCAC 1J .0614 of this Section constitute just cause for discipline or dismissal." 25 NCAC 01J .0604(c). Unacceptable personal conduct, the reason for dismissal in *115 this case, includes "the willful violation of known or written work rules." 25 NCAC 01J .0614(8)(d).
In Warren , as noted by the majority, this Court delineated a three-part inquiry to guide courts in determining whether an employee was dismissed for "just cause" for unacceptable personal conduct:
[T]he best way to accommodate the Supreme Court's flexibility and fairness requirements for just cause is to balance the equities after the unacceptable personal conduct analysis. This avoids contorting the language of the Administrative Code defining unacceptable personal conduct. The proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken.
Warren , 221 N.C.App. at 382-83, 726 S.E.2d at 925 (citations and footnote omitted). Applying *142 Warren 's framework in the present case, I, too, find the first two inquiries satisfied.[3] As to the first inquiry, the unchallenged findings of fact provide that Petitioner punched Walls in the stomach with his fist, without provocation, and at a time when Walls was restrained and under the complete control of multiple correctional officers. As to the second inquiry, Petitioner's conduct amounted to the "willful violation of known or written work rules," which is one of the instances of unacceptable personal conduct pursuant to 25 NCAC 01J .0614(8)(d).
However, I must disagree with the majority as to "the third inquiry: whether [the petitioner's] misconduct amounted to just cause for the disciplinary action taken." Warren , 221 N.C.App. at 382-83, 726 S.E.2d at 925. After considering the totality of the facts and circumstances of the present case, I believe Petitioner's actions of unacceptable personal *116 conduct gave rise to "just cause" for his termination by Respondent. The unchallenged findings show that Petitioner punched an inmate in the stomach with his fist, without justification, and while the inmate was restrained, compliant, and under the complete control of other correctional officers. The three correctional officers present at the scene, and tasked with removing Walls from his cell, testified as to Petitioner's actions, and their effect on Walls.
Officer Johnson testified that Petitioner entered through a side door, said to Walls, "you think this is funny," and punched Walls in the stomach. Officer Johnson explained that the "blow was unexpected," and it caused Walls to "ma[ke] a sound" and fall to the ground. Officer Alexander likewise described Walls' reaction to Petitioner's punch: "[Walls] grunted, leaned forward, shook his head, and stood back up." Petitioner found this funny, and "laugh[ed] all the way" from the scene of the assault to Walls' holding cell. Officer Johnson "couldn't believe [Petitioner] did what he did," and was so astonished that he needed "to clear [his] head." Petitioner later sought out Officer Johnson and, while refusing to answer "why [he] hit that inmate for no reason," explained that the fact the assault occurred in a known blind spot was not coincidental; Petitioner explained that he waited to strike until Walls was in a known blind spot: Petitioner explained to Officer Johnson that "[h]e knew where all the blind spots was [sic], and the camera didn't pick up nothing. Didn't see it." Petitioner also threatened Officer Johnson, telling Sergeant Grantham that "if [Officer] Johnson wrote anything against him, that he [Petitioner] was going to hurt Johnson."
Petitioner was aware of Respondent's Use of Force policy, which limited use of force to a "last resort" and prohibited force as a form of punishment. The reason for Petitioner's attack on Walls was not inmate safety, institutional security, or some other legitimate penological purpose; rather, Petitioner punched Walls as "some form of retribution" for spreading feces in his cell. The majority places great weight on various "mitigating factors" found by the ALJ including, inter alia : (1) Petitioner's good prior work history, including a "good working relationship with Walls;" (2) that Petitioner was not working his regular shift; (3) the absence of bruising on Walls thirty minutes after the assault; and (4) the fact that Walls was "walking erect, smiling, and in no apparent distress" after the incident.
Given the testimony of three correctional officers, who unanimously testified to Petitioner's use of unwarranted physical force on an inmate, Petitioner's prior work history or prior "good working relationship" with Walls has little relevance to the question of whether Respondent had *117 just cause to terminate Petitioner. Regardless of his past work history, I find Petitioner's present acts troubling; Petitioner laid in wait until Walls was in a known blind spot, approached and punched him in the stomach as "some form of retribution" for spreading feces in his cell, found Walls' physical response to being punched funny, and subsequently threatened violence against another officer if that officer reported the incident. And while it appears to me *143 that Petitioner's punch was of much greater force than the majority and the ALJ believe-Officer Johnson testified that the force of the punch brought Walls to the ground, and Officer Alexander characterized Walls as keeling over and shaking his head-the force of Petitioner's punch has little relevance to the just cause determination in the present case.
Notwithstanding Petitioner's positive performance reviews and his lack of problems preceding this incident, I would hold that a single incident of intentionally and maliciously punching a restrained and compliant inmate for no legitimate penological purpose in violation of Respondent's Use of Force policy amounts to unacceptable personal conduct that provides just cause for termination, regardless of the amount of force used.
Nearly all of North Carolina's correctional officers endeavor on a daily basis to ensure the public's safety and undertake their duties in a professional manner, and society calls on our correctional officers to make judgments to assure the safety and security of the public and inmates alike. See Blackburn v. N.C. Dep't of Pub. Safety , --- N.C. App. ----, ----, 784 S.E.2d 509, 528 (2016) (noting that the "most important 'job requirement' " of a correctional officer is "that of exercising good judgment in a supervisory position of great responsibility"). Under the majority's rationale, so long as a correctional officer has maintained a positive work history and injures an inmate in a way that does not leave physical markings, Respondent does not have just cause to remove that officer from his or her position, a position of great trust and confidence. Id.
III. Conclusion
I agree with the majority that an administrative law judge "owes no deference to the agency's conclusion of law that ... just cause existed" for the action taken by the agency, and that "[a]fter receiving and considering the evidence, and entering findings of fact, an administrative law judge is free to substitute their judgment for that of the agency as to the legal conclusion of whether just cause ... existed for the agency's action." However, I respectfully dissent from the majority's reliance on the standards of review in N.C.G.S. § 150B-51. Because judicial review is *118 established for cases of this type in "another statute"-namely, N.C.G.S. § 126-34.02 -I believe N.C.G.S. § 150B-51 is not applicable to this case. I further dissent from the majority's application of Warren 's third prong, and would conclude that Petitioner's actions provided Respondent with just cause to terminate Petitioner for unacceptable personal conduct. Therefore, I would reverse the decision of the ALJ.

I would further note that nothing in N.C.G.S. § 126-34.02(a)(3) suggests that an ALJ is granted authority to substitute his or her judgment for that of the relevant agency as to the correct disciplinary action to be imposed. N.C.G.S. § 126-34.02(a)(3) only gives the ALJ the authority to remedy any damages to a petitioner flowing from an incorrect discipline imposed by a final agency decision.

While the standards of review provided in N.C.G.S. § 150B-51 are inapplicable, the standards of review that are applicable to judicial review of contested cases of this nature are well established, and are cited by the majority. Findings of fact are reviewed under the whole record test, and conclusions of law are reviewed de novo . See N.C. Dep't of Env't & Natural Res. v. Carroll , 358 N.C. 649, 655, 599 S.E.2d 888, 898 (2004) ; Barron v. Eastpointe Human Servs. LME , --- N.C. App. ----, ----, 786 S.E.2d 304, 310-11 (2016).

Although our Supreme Court is not bound by Warren 's three-prong analysis, see, e.g. , Northern Nat'l Life Ins. v. Miller Machine Co. , 311 N.C. 62, 76, 316 S.E.2d 256, 265 (1984), Warren 's analysis is a helpful conceptualization of N.C. Dep't of Env't & Natural Res. v. Carroll , 358 N.C. 649, 599 S.E.2d 888 (2004), and is useful in the just cause analysis.